**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Leonardo Cerda BARRERA, a/k/a Porky
and Faustino Copado Leyva,
Defendants-Appellants.**

**No. 76–1451.**

United States Court of Appeals,
Fifth Circuit.

March 3, 1977.

Alan Brown, San Antonio, Tex., for defendants-appellants.

John E. Clark, U. S. Atty., W. Ray Jahn, Le Roy Morgan Jahn, Asst. U. S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before COLEMAN, AINSWORTH and INGRAHAM, Circuit Judges.

AINSWORTH, Circuit Judge:

Appellants Leonardo "Porky" Barrera and Faustino Leyva, along with codefendants Juan Gamez, Francisco Bueno, and Victor Lesa, were indicted for conspiring to possess and possession with intent to distribute, approximately 875 grams of heroin, in violation of 21 U.S.C. §§ 846 and 841(a)(1), respectively.[1] A jury returned a verdict of guilty against Barrera and Leyva on both counts and they were sentenced to 15 years' imprisonment and a special parole term of 20 years on each count, the sentences to run consecutively.[2] Barrera and Leyva appeal, raising several issues, most importantly that the evidence was insufficient to warrant conviction. We agree with appellants that the evidence was insufficient to support the convictions and therefore reverse without reaching the additional issues raised.

The Government presented testimony regarding negotiations which resulted in the purchase of a quantity of heroin by Officer Reina.

---

1. The indictment charged:

 That beginning on or before May 30, 1975, and continuing until the return of this indictment, in the Western District of Texas, and divers other places unknown to the grand jurors, Defendants FRANCISCO RODRIGUEZ BUENO, JUAN YEDUARTE GAMEZ, VICTOR GOMEZ LESA, LEONARDO CERDA BERRERA; aka: PORKY, and FAUSTINO COPADO LEYVA, and other persons to the grand jurors unknown, unlawfully, wilfully and knowingly did combine, conspire, confederate and agree together and with each other, to commit offenses against the United States, to-wit: to possess with the intent to distribute a quantity of heroin, a Schedule I Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), and in furtherance of said unlawful conspiracy, and to effect the objects thereof, the following overt acts, among others, were committed:

 1. On or about May 30, 1975, in the Western District of Texas, Defendant FAUSTINO COPADO LEYVA purchased a 1970 Ford Station Wagon, in the name of Ruben Estrella.

 2. On or about June 24, 1975, in the Western District of Texas, Defendant JUAN YEDUARTE GAMEZ had a meeting with San Antonio Police Officer Russell F. Reina, to discuss the purchase of heroin.

 3. On or about June 24, 1975, in the Western District of Texas, San Antonio Police Officer Russell F. Reina and Defendant JUAN YEDUARTE GAMEZ travelled to Macdona, Texas, for the purpose of facilitating the purchase of a quantity of heroin by Officer Reina.

 4. On or about July 17, 1975, in the Western District of Texas, Defendant FRANCISCO RODRIGUEZ BUENO had a telephone conversation with Officer Reina concerning the purchase of a quantity of heroin by Officer Reina.

 5. On or about July 17, 1975, in the Western District of Texas, Defendant FRANCISCO RODRIGUEZ BUENO, Officer Reina, and Special Agent Albert Castro of the Drug Enforcement Administration, had a meeting to discuss the purchase of heroin.

 6. On or about July 17, 1975, in the Western District of Texas, Officer Russell Reina, Special Agent CASTRO, and Defendant FRANCISCO RODRIGUEZ BUENO travelled to a location on Somerset Road near San Antonio.

 7. On or about July 17, 1975, in the Western District of Texas, Defendants FRANCISCO RODRIGUEZ BUENO, JUAN YEDUARTE GAMEZ, and LEONARDO CERDA BARRERA; aka: Porky, had a meeting at a location on Somerset Road near San Antonio.

 8. On or about July 18, 1975, in the Western District of Texas, Defendant FRANCISCO RODRIGUEZ BUENO, Officer Reina, and Special Agent Castro, had a meeting and then travelled to 1614½ South Presa Street, in San Antonio.

 9. On or about July 18, 1975, in the Western District of Texas, Defendants FRANCISCO RODRIGUEZ BUENO and JUAN YEDUARTE GAMEZ, showed Officer Russell Reina approximately 18 ounces of heroin, hidden in the door panel of a 1970 Ford Station Wagon, which was registered in the name of Ruben Estrella.

 All in violation of Title 21, United States Code, Section 846.

2. Codefendants Bueno and Gamez entered a plea of guilty to the substantive count and were tried and convicted on the conspiracy count. Codefendant Lesa was found not guilty.

purchase of one ounce of heroin on June 27, 1975 and the seizure of two additional caches of heroin, weighing approximately 18 ounces and 10½ ounces, respectively, on July 18, 1975. The following incidents led to the Government's seizure of the contraband on the two days in question.

*Incidents preceding the June 27 transaction.*

On April 18, 1975, Mary Leyva, the common-law wife of appellant Leyva, rented property known as the Macdona Pool Hall in Macdona, Texas, from the brother-in-law of appellant Barrera. A pay telephone with the number 622–9232 was installed there. The application for a post office box rented by Leyva shortly thereafter shows the same telephone number.

On May 29, 1975, Mike Slaughter, a mechanic, rented property at 1614½ South Presa Street in San Antonio, Texas, which was used as a garage and repair shop. On the following day the Leyvas purchased a 1970 Ford station wagon from a used car dealer in San Antonio for $300 cash and a 1970 Oldsmobile Cutlass in trade. The Cutlass, however, was registered in the name of Mike Slaughter, and it was necessary for the Leyvas to get Slaughter from his garage to execute the title-transfer instruments on the Cutlass. At the request of the Leyvas the newly purchased Ford station wagon was then registered in the name of one Ruben Estrella. The Leyvas gave their post office box number as Estrella's address.

*Incidents relative to the June 27 purchase of heroin.*

On June 24, 1975, Russell F. Reina, San Antonio police officer, working as an undercover agent with the Federal Drug Enforcement Administration, met codefendant Gamez at a San Antonio restaurant and talked about the purchase of a pound of heroin. Gamez agreed to arrange for a one-ounce sample. Agent Reina and Gamez proceeded to a service station-cafe at Von Ormy, Texas, where Reina was to remain while Gamez obtained the sample from his source. Gamez, followed by government surveillance agents, drove to Macdona, Texas, and parked his vehicle behind the Macdona Pool Hall. Officer Seay, one of the surveillance agents, observed an unidentified man, whose physical characteristics fit those of Leyva, walk toward the Gamez vehicle. Gamez then returned to the cafe at Von Ormy and told Reina that his source, "Porky," wanted advance payment before he would deliver. Agent Reina refused to hand over the money whereupon Gamez agreed to take Reina closer to his source. They both then rode to Macdona in the government vehicle where Reina parked a short distance from the pool hall. Reina gave Gamez $100 in cash and remained in the vehicle while Gamez walked down the street in the direction of the pool hall and disappeared from sight. He returned approximately 20 minutes later but without the heroin sample. Gamez' explanation to Reina for the breakdown in negotiations was that "Porky" was upset that Reina was "so close to the house." Gamez assured Reina, however, that he would attempt to locate another source for the purchase.

Thereafter, on June 26, 1975, Gamez informed Agent Reina that "he wasn't going to do it with the people in Macdona; that he had gone to another person who was a good friend of his who had a source or supply for heroin and he was going to introduce [Reina] to him." Gamez introduced Reina to codefendant Bueno.

The next day, June 27, 1975, Bueno and Gamez rode with Agent Reina to an ice house in Losoya, Texas, where they met Abelardo F. Flores. After a brief conversation the four men drove to a ranch site southeast of Losoya. Gamez and Flores jumped a gate, walked to a building on the site, and returned 15 minutes later. Gamez handed Reina a one-ounce package of heroin in return for $900 cash. Gamez in turn gave the money to Flores.

*Incidents relative to the July 18 confiscation.*

On July 17, 1975, Bueno told Agent Reina to meet him at his home in San Antonio. Reina complied, accompanied by Special

Agent Albert Castro. The three men then rode to the intersection of Interstate 35 and Somerset Road in San Antonio. After instructing the officers to return for him in 15 minutes, Bueno walked down Somerset Road and disappeared into a field. The officers observed a red 1950 Ford pickup truck in the field. The pickup truck (which was later determined to be registered in the name of appellant Leyva) left the field and proceeded north on Somerset Road. Agents Reina and Castro returned within the prescribed 15 minutes where they observed codefendants Bueno and Gamez walking toward them up Somerset Road. Gamez told Reina that "the man had gone to the ranch to get the heroin" and would return in an hour. The four men left in the government vehicle and returned approximately an hour later. The red pickup truck was again seen driving toward them. Gamez remarked that it was "the connection" returning from the ranch. On instructions from Gamez, the officers stopped their vehicle whereupon the truck pulled in directly behind them. Appellant Barrera was identified by Reina and two government surveillance agents as the driver of the truck. Gamez and Bueno walked over to the truck and talked with Barrera within sight of, but out of hearing of, the officers. Bueno returned to the government vehicle and told Reina that "the man"[3] saw a suspicious-looking blue vehicle in the vicinity and did not want to deliver the heroin at that time. Bueno instructed Reina to telephone him the next morning. (It was later determined that one of the surveillance agents was in the area in a blue car.)

The following day, July 18, 1975, Reina telephoned Bueno at his apartment. Bueno remarked that "the man" had already been there and that the deal was on. The red pickup truck was twice seen by surveillance officers driving past Bueno's apartment. There was no testimony that it stopped there. Agents Reina and Castro went to Bueno's apartment as prearranged where Bueno directed them to drive him to the garage on South Presa Street in San Antonio. This was the garage which had been rented by Mike Slaughter on May 29, 1975. Gamez was in the garage upon their arrival. Also in the garage was the 1970 Ford station wagon previously purchased by appellant Leyva and his common-law wife in the name of Ruben Estrella. Gamez extracted 18 ounces of heroin from a secret compartment of the station wagon, and Bueno and Gamez were arrested. The vehicle was later searched and an additional 298.7 grams of heroin was found concealed therein. A matchbook was found on Gamez on which was written the telephone number of the Macdona Pool Hall and the word "Porky."

On August 8, 1975, appellant Barrera was again seen by Reina in the red Ford pickup truck in the vicinity of Macdona. While questioning Barrera, Reina observed a tattoo on Barrera's arm of the word "Porky."[4]

At the conclusion of the Government's case, and following denials by the trial court for judgments of acquittal, codefendants Bueno and Gamez, having previously entered a plea of guilty to possession, testified in their own behalf relative to the conspiracy count. Mary Garcia Leyva testified for appellant Leyva.

Bueno and Gamez said that the sole source of the heroin was Abelardo Flores. They denied that they ever discussed any kind of narcotic transaction with appellants Leyva and Barrera or solicited the help of either of them in obtaining it.

Mary Garcia Leyva testified that she had been living with appellant Leyva as his common-law wife since February 14, 1974. She paid the rent on the Macdona pool hall

---

3. Agent Reina said on cross-examination that Flores was at times referred to by both Bueno and Gamez as "the man" and that Flores was Bueno's connection for the heroin. D.E.A. personal history reports prepared by the Government as to Bueno and Gamez, and introduced into evidence by those defendants, show Flores as the source of supply.

4. On cross-examination Agent Reina acknowledged that his report shows that a Jimmie Rodriguez Duran also used the alias "Porky." Gamez testified that the telephone number was given to him by Jimmie Duran.

property. Appellant Barrera operated the bar with appellant Leyva's assistance. The witness also testified in regard to several negotiations which she had had with Mike Slaughter for the sale, purchase and trade of used cars. *See* footnote 5, *infra.*

■ In a criminal case the Government must prove every element of the offense beyond a reasonable doubt. In this respect, circumstantial evidence is intrinsically no different from direct evidence, *Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954), and the same test for judging the sufficiency of the evidence should apply whether the evidence is direct or circumstantial. *United States v. Gomez-Rojas,* 5 Cir., 1975, 507 F.2d 1213, 1221; *United States v. Moore,* 5 Cir., 1974, 505 F.2d 620, 623; *United States v. Warner,* 5 Cir., 1971, 441 F.2d 821, 825. Therefore, in testing the sufficiency of the evidence in this circumstantial evidence case it was the duty of the trial judge, before sending the case to the jury, to determine whether a reasonably minded jury must necessarily entertain a reasonable doubt under the evidence. *United States v. Haggins,* 5 Cir., 1977, 545 F.2d 1009. We have carefully analyzed the evidence and, in our view, the trial judge should not have sent the case to the jury because under the circumstances presented herein he should have determined that a reasonably minded jury must necessarily have had a reasonable doubt of the guilt of Barrera and Leyva. In other words, "a motion of acquittal must be granted when the evidence, viewed in the light most favorable to the Government, is such that a reasonably minded jury *must* have a reasonable doubt as to the existence of the essential elements of the crime charged." *United States v. Reynolds,* 5 Cir., 1975, 511 F.2d 603; *United States v. Kohlmann,* 5 Cir., 1974, 491 F.2d 1250; *United States v. Hill,* 5 Cir., 1973, 481 F.2d

929, 931; *United States v. Stephenson,* 5 Cir., 1973, 474 F.2d 1353, 1355.

■ *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), requires us to examine the evidence in the light most favorable to the Government in reviewing a jury verdict, but it does not compel judicial abdication to the findings of the trier of fact. *United States v. Peterson,* 5 Cir., 1974, 488 F.2d 645; *United States v. Ferg,* 5 Cir., 1974, 504 F.2d 914. With these standards in mind, we analyze the evidence on which the Government relies to prove possession and conspiracy.

*The substantive count.*

■ In its brief as well as in argument the Government placed little, if any, emphasis on the substantive count of possession, relying instead on appellants' alleged participation in the conspiracy. Our review of the record shows no evidence indicating that appellants actually possessed the heroin. Nevertheless, if there is a reasonable basis for a finding of constructive possession affirmance of the convictions would be necessary. *United States v. Ferg, supra; United States v. Horton,* 5 Cir., 1973, 488 F.2d 374; *Garza v. United States,* 5 Cir., 1967, 385 F.2d 899. Constructive possession has been defined as the exercise of dominion or control over the proscribed substance. *United States v. Horton, supra; United States v. Stephenson,* 5 Cir., 1973, 474 F.2d 1353; *United States v. Mendoza,* 5 Cir., 1970, 433 F.2d 891; *Garza v. United States, supra.*

■ The only possible connection between Leyva and the heroin was evidence tending to show that Leyva or his wife at one time owned the station wagon in which the heroin was concealed. While it was stipulated that the station wagon was paid for by a check drawn on the account of Faustino C. or Mary A. Leyva and signed by Mary Leyva, it was likewise stipulated that the vehicle was registered in the name of Ruben Estrella.[5] There was no evidence

5. Mary Leyva testified that Slaughter received in trade for the Cutlass the 1950 red pickup Ford, that the Cutlass and $300 cash were traded to the used car dealer for the 1970 Ford station wagon which she purchased for Estrella. When Estrella defaulted in payments she sold the station wagon to Mike Slaughter. While the jury was free to discredit her testimony, there was no evidence to contradict it except that title to the station wagon remained in the name of appellant Faustino Leyva.

that appellant Leyva was ever observed driving the vehicle or that he maintained any control over it. The government witness, Joe Gonzales, a car salesman in the San Antonio area who referred the Leyvas to the used car lot from which the station wagon was purchased, said that it was not uncommon for people when buying a car, with the intention of reselling it, to register it in the name of the prospective purchaser. Even if we were to assume that the jury inferred from the evidence that appellant Leyva owned the station wagon, mere ownership of a vehicle containing contraband is insufficient to constitute constructive possession. *See, e. g., United States v. Horton, supra.*

There was even less evidence to justify the jury verdict of possession against Barrera. While he was observed on two occasions in the pickup truck registered in Leyva's name, no contraband was found in that vehicle. No connection between him and the station wagon in which the contraband was secreted was established. Neither he nor Leyva was at the scene of the two heroin transactions and there was no proof that either of them had at any time handled the contraband. In short, there was no proof of possession, actual or constructive.

*The conspiracy count.*

The essential elements of a criminal conspiracy are an agreement among the conspirators to commit an offense against the United States attended by an overt act by one of them in furtherance of the agreement. *United States v. Isaacs,* 5 Cir., 1975, 516 F.2d 409; *United States v. Reynolds,* 5 Cir., 1975, 511 F.2d 603; *United States v. Guajardo,* 5 Cir., 1975, 508 F.2d 1093. While no formal agreement nor direct evidence is necessary to establish a conspiracy, *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), there must be proof beyond a reasonable doubt that a conspiracy existed, that the accused knew it, and with that knowledge intentionally did something to further that

conspiracy. *Causey v. United States,* 5 Cir., 1965, 352 F.2d 203.

Except for the fact that Leyva and Barrera worked together at the Macdona Pool Hall, there is no evidence that Leyva at any time during the alleged conspiracy talked with any of the named co-conspirators or communicated in any manner whatsoever with them. The Government makes much of the fact that Leyva visited Mike Slaughter at the garage where the heroin was found. Slaughter, however, was not named as a co-conspirator. Moreover, the Government's proof established only one instance when, for the purpose of having Slaughter sign title instruments for an Oldsmobile Cutlass, Leyva was actually present on Slaughter's premises during the time in question. It is well established that mere presence at the scene of the crime is not sufficient to establish participation in a conspiracy. *See United States v. Falcone,* 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940); *United States v. Owen,* 5 Cir., 1974, 492 F.2d 1100. Also, there is no evidence whatsoever that any of the agents discussed the purchase or sale of heroin with either Leyva or Barrera.

The strongest evidence against Barrera was his meeting and conversation on July 17 with defendants Bueno and Gamez on Somerset Road. The contents of that conversation, however, were unknown to Agents Castro and Reina. While the jury might have inferred from that incident that Barrera was "the man" who, except for his doubts caused by the suspicious-looking blue car, would have immediately concluded the heroin negotiations or led the government officers to the proper connection, it could also have concluded that Barrera refused to go along with any scheme proposed by Bueno and Gamez, or that they had not talked about narcotics. The July 17 venture was a "dry run." Although the Government established that Gamez had the telephone number of the Macdona Pool Hall with the name "Porky" written beneath it, there was no evidence that the telephone was ever used by any of the

conspirators to further the conspiracy or that "Porky" Barrera was the individual referred to. Jimmie Duran, according to Agent Reina's testimony, was also known as "Porky," and the Macdona Pool Hall telephone was a public telephone accessible to anyone who wished to use it.

While there was evidence to support the commission of the two overt acts in the indictment naming appellants Leyva and Barrera, *i. e.,* the purchase of the Ford station wagon by Leyva and the meeting of Barrera with Gamez and Bueno, this alone is not determinative of guilt. Acts which are in themselves not unlawful lose that character when they become constituent elements of a criminal conspiracy; however, without proof of the accused's knowledge that a conspiracy existed and participation therein, the attendant overt acts are of no probative value. *See United States v. Amato,* 5 Cir., 1974, 495 F.2d 545; *Causey v. United States, supra.* We find that the evidence adduced was inadequate to warrant the inference that appellants knew of the conspiracy, much less the inference that they knowingly and intentionally participated in it. The Government's case was based on unsupported inferences and at most amounted to a showing of association among some of the alleged conspirators. Leyva associated with Barrera who (at least on one occasion) associated with Bueno and Gamez. But mere association with other persons involved in a criminal enterprise is insufficient to prove participation in a conspiracy. *United States v. Menichino,* 5 Cir., 1974, 497 F.2d 935; *United States v. Owen,* 5 Cir., 1974, 492 F.2d 1100; *United States v. Diez,* 5 Cir., 1975, 515 F.2d 892; *United States v. James,* 5 Cir., 1976, 528 F.2d 999.

Our review of the evidence convinces us that the Government failed to prove, directly or circumstantially, either count of the indictment and that it was unreasonable for the jury to so conclude. The motion for acquittal should have been granted.

REVERSED AND RENDERED.