UNITED STATES of America,
Plaintiff-Appellee,

v.

Troy BECKER, James Cockrell, Kyle G.
Bretz and James McCollom,
Defendants-Appellants.

No. 76–4484.

United States Court of Appeals,
Fifth Circuit.

March 20, 1978.

**954**

Edith L. James (court appointed), Dallas, Tex., for Cockrell.

Donald C. McCleary, John T. Kipp (court appointed), Dallas, Tex., for Bretz.

Robert L. Crider, Waggoner Carr, Austin, Tex., for McCollom.

Malcolm L. Edwards, Charles K. Wiggins, Seattle, Wash., for Becker.

Kenneth J. Mighell, U. S. Atty., Fort Worth, Tex., Judith A. Shepherd, Jay Ethington, Richard H. Stephens, Asst. U. S. Attys., Dallas, Tex., for plaintiff-appellee.

Before TUTTLE, COLEMAN and RONEY, Circuit Judges.

TUTTLE, Circuit Judge:

The four appellants, Bretz, McCollom, Becker, and Cockrell, were convicted in the United States District Court for the Northern District of Texas of conspiracy to defraud in violation of 18 U.S.C. § 371 and fifteen substantive offenses committed in furtherance of the conspiracy, consisting of mail fraud, wire fraud, and interstate transportation of checks taken by fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 2314. The appellants were four of eight persons named as co-conspirators in the government's indictment. One of the alleged co-conspirators, McCord, pleaded guilty to conspiracy and two counts of mail fraud and became the government's principal witness. One other person, Dunkle, was tried with the appellants but died after the trial. Two others were not apprehended in time for the trial.[1] On appeal all four appellants challenge the sufficiency of the evidence to support the jury verdict and the denial of their motions for severance. Three of the appellants argue that the government's evidence showed three conspiracies, if any, rather than the one alleged, thus creating a fatal variance between the indictment and the proof. Having carefully considered these and the several other points raised by the appellants, we affirm their convictions on all counts.

In a challenge to the sufficiency of the evidence to support a jury verdict, we are required to view the evidence in the light most favorable to the government, making all reasonable inferences and credibility choices which will uphold the verdict. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). It is in this light that we proceed to sketch the facts upon which this appeal is based before addressing the issues raised by the appellants.

The fraudulent scheme which led to the convictions centered around a low-grade graphitic schist ore located in the vicinity of Llano, Texas. Over a period of time the appellants induced investments of large

---

1. One of these co-indictees, C. W. Deaton, was later apprehended, tried separately, and convicted on all counts. His appeal is pending before this court. The remaining co-indictee, H. M. Wolstencraft, remains at large.

amounts of money by representing to potential investors that the ore contained enormous quantities of gold and silver which were capable of low-cost extraction in commercial quantities by means of various secret processes. The investments took many forms, including silver options, refining contracts, loan advance fees, and outright loans. It was the government's contention, substantiated by evidence at trial, that the ore was of little value, that no commercially feasible extraction process existed, and that the conspirators knowingly duped the investors for purposes of their own financial gain. A key element in the government's proof of the value of the ore was testimony relating to a 1970 SEC investigation of Llano ore. Tests performed at that time by the Bureau of Mines and private laboratories on samples of Llano ore revealed that the ore contained barely a trace of precious metals. Other testimony indicated that a very good mine would yield perhaps 40 ounces of silver per ton, while the appellants were claiming returns of many hundreds and even thousands of ounces of silver per ton as well as large quantities of gold.

The alleged members of the alleged conspiracy functioned in different capacities, according to the government, but all strived for the common goal of mutual enrichment. Cockrell and Becker (plus deceased co-defendant Dunkle) were involved in the "scientific" aspects of the scheme. They produced assays or reports which showed large concentrations of gold and silver in the ore and also worked on developing processes for silver extraction. Their assays, as well as other high assays from other sources, were shown to potential investors and were key elements in the investors' decision to part with their money. The actual fund-raising efforts were directed by Bretz, McCord, and McCollom. The complex maneuverings by which these men sought to lure outside investors spanned much of 1974 and 1975, although overt acts allegedly performed in furtherance of the conspiracy preceded that.

For some time prior to 1973, the Llano ore was excavated by Graphilter Corporation for use in water filters. Graphilter had the ore assayed in 1970 and continued to sell the pulverized rock for about $35 per ton. In September 1972 Bretz purchased 800 tons of Graphilter "fines," the fine grey rock dust which was a by-product of Graphilter's production. The fines, which were unsuitable for Graphilter's purposes, usually sold for about $2 per ton. That same year Bretz also helped organize Texas Western Mining, Milling & Processing Corporation to process Llano ore. Bretz and McCord met in 1972, and McCord became a director of Texas Western. In December 1973 McCord, who at that time was also a practicing attorney,[2] negotiated on behalf of Texas Western for the $75,000 purchase of Graphilter's assets, which consisted of two mineral leases and a rock-crushing plant. Subsequently, Bretz obtained another lease in the Llano area, and McCord formed his own corporation, Tex-A-Chief, which owned 100,000 tons of Llano ore.

Once the ore was in their control, Bretz, who also did business as Kyle Bretz Enterprises, employed Dunkle and various others to assay the ore and to work toward developing a commercially feasible process. Meanwhile McCord employed Cockrell as a consultant for Tex-A-Chief on processing, mining, and building a plant for Llano ore. Bretz and McCord were also working simultaneously on the purchase of various plants at which extraction and refining could occur. Bretz had an option to purchase the J & J Smelting & Refining Corporation in Hesperia, California, where Dunkle had worked. McCord set up a plant in Waxahachie, Texas, and installed Cockrell there to work on the Llano ore and to extract silver from X-ray film. McCord also consulted with Dunkle about building his own plant, and Bretz apparently intended also to use Becker's facilities. However, Bretz did not follow through on the purchase of J & J;

2. He resigned his license to practice law in July 1974 because his license was about to be revoked due to difficulties in an unrelated matter.

McCord eventually lost the Waxahachie plant because of his failure to pay the rent; and none of the other plants ever materialized.

The evidence shows that Bretz and McCord began their money-raising efforts in early 1974. Seeking financial backing for the purchase of processing plants and the development of commercial extraction processes, McCord approached his friend McCollom, whose membership in a commodities exchange group provided him with contacts which McCord hoped would prove useful. On behalf of himself and Bretz, McCord offered certain deals by which McCollom's associates in Executive Exchange could purportedly reap quick profits by purchasing refining options. Although McCollom was able to find some purchasers, these early efforts were largely unsuccessful, and McCord and Bretz continued to consult with McCollom in hopes of finding larger sums of money. At this same time McCollom, who did business as Shoreline Holding Company and Gourmet Chef, was seeking funding to obtain the international distribution rights to a newly invented freon cooling container called Chill-Can. McCollom agreed that, if his Shoreline Holding Company was successful in obtaining a $5 million underwriting for Chill-Can, Shoreline would lend Tex-A-Chief $1 million to enable it to build and operate a refinery and smelter near Llano. Written contracts were executed on behalf of Shoreline, Tex-A-Chief, and Texas Western, providing for the assignment of Texas Western's mining rights in 10 million tons of ore to Tex-A-Chief and the purchase of 18,750 tons of ore by Shoreline. Tex-A-Chief was to begin processing the ore by September 1974 and to share the smelter returns with the other two companies. The ore was represented to have a minimum value of $800 per ton in precious metals. Tex-A-Chief's agreement with Shoreline fell through in June 1974, however, when Shoreline's underwriting efforts failed. During the course of these early dealings, McCollom lent Bretz $3,700 in exchange for Texas Western ore.

Around June 1974 McCollom suggested the use of silver options as a means of raising money for Tex-A-Chief. Because McCollom had been enjoined from the sale of securities and feared that the sale of silver options might violate the injunction, he and McCord agreed that Commonwealth Commodities, a newly organized Arizona intrastate securities dealer run by Thomas and Merkatz, would have the exclusive right to sell Tex-A-Chief options and to set the price charged to the customer. Whatever the purchase price, Commonwealth would pay Tex-A-Chief $1,500 for every option sold. Tex-A-Chief, in turn, would pay $500 per option to Gourmet Chef for the use of its Telex and Reuters machines, for processing the options, and for mailing the option certificates. Wire transfers of money from Commonwealth to Tex-A-Chief gave rise to three of the substantive counts. In enlisting the services of Commonwealth, McCord and McCollom displayed a number of documents to Merkatz and Thomas. Merkatz testified that he relied upon the representations contained in these documents in deciding to participate in the option sales and in making representations to his sales personnel. The documents included a copy of the purported contract between Tex-A-Chief and Shoreline which stated that Shoreline had a "firm underwriting contract" for $5 million. Merkatz was also shown a letter from Dunkle to Shoreline, which claimed that a process existed for the extraction of $800 per ton in precious metals from Llano ore, and a March 10, 1972 assay by Becker, which asserted that his "nuclear affinity" tests had shown the ore to be 30.43% silver and 21.24% gold. Tex-A-Chief promised to provide performance bonds issued by International Surety and Casualty Company (owned by absent co-indictee Deaton) to ensure that purchasers of options would double their money within one year. Merkatz was told that the surety company's net worth exceeded $42 million. A total of 78 options were sold between June and September 1974. As part of the government's proof of the five mail fraud counts, five purchasers testified at trial that they had

mailed Tex-A-Chief either their option certificates or letters of authorization as instructed by McCord in an effort to exercise their options at the proper time. They received no money. McCord testified that there was never any silver in reserve, no options by which Tex-A-Chief could obtain silver, and no feasible process for extracting silver from Llano ore.

In July 1974 some option brokers and potential investors met in Dallas with McCord, Thomas, and Cockrell. Nickerson, a consulting geological engineer, who accompanied the investors, took six samples of Llano ore and had them assayed by a private laboratory. The results showed silver values ranging from .02 to 2.21 ounces per ton, far lower than the 200 ounces of silver per ton which Cockrell had cited as his average to Nickerson. Nevertheless, Nickerson thought the results might be of some significance, and he returned to Dallas in August to witness a demonstration conducted by Cockrell for investors and option brokers. The purpose of the demonstration was to show that high values of silver could be recovered from the ore by means of the Henderson process, which was one of the secret processes which Bretz had paid for. Testimony at trial went into great detail concerning this demonstration. The key elements of that testimony showed that Cockrell reported results of 980 ounces of silver per ton. Nickerson's independent assay of the same sample put the precious metal content at .04 ounces of gold and .26 ounces of silver per ton. Nickerson advised his clients to "run like the dickens" if they wanted high values of precious metals. He also advised the potential investors whom he represented that further study of the ore and the secret process was necessary to determine if a high-volume, low-grade operation would be profitable. He hypothesized that, if certain facts existed, the ore might be worth $48 million, but without further study he could not determine whether the ore could be profitably mined. His hypothetical estimate of $48 million stands in sharp contrast to the billions of dollars in silver value claimed in the reports he had been shown. Nickerson's clients chose not to invest.

While McCord and McCollom were involved in the sale of silver options, McCord and Bretz instigated a plan to sell refinery contracts through a group of Indiana investors organized for that purpose as Executor Marketing. Bretz represented to members of the group that the ore was worth $40,000 per ton, that he could produce at least one ton a day, that production could begin within 21 days of receipt of financing, and that International Surety and Casualty would guarantee that buyers of the contracts would double their money in 180 days. Members of Executor Marketing met in Dallas with McCord and Bretz in June 1974 to discuss the sale of refinery contracts. The Executor Marketing group was shown financial statements which put Bretz' net worth at over $90 million and the surety company's assets at over $47 million. They also saw reports from Dunkle and Becker attesting to the high value of the ore. During this meeting one representative of Executor Marketing (Fisher) had a phone conversation with a man who said that he was Becker. Becker denied the phone conversation at trial, but Fisher testified that the man identified as Becker on the phone confirmed the validity of his 1972 assay, attested to the value of the Llano ore, said that he had an extraction process for the ore, and agreed to prepare an "update" of his 1972 assay. A Bretz employee subsequently sent samples to Becker, who sent his new assay to Bretz in July 1974. The second assay, reporting values of 20.3% gold and 30.3% silver in the ore, was shown to Executor Marketing people. However, Bretz would not permit them to take their own samples for independent analysis.

Negotiations between Bretz and Executor Marketing resulted in a contract whereby Executor Marketing had an option to purchase up to 10,000 tons of ore at $1,000 per ton to be refined by Bretz, who certified that each 2,500 tons would yield at least $5 million in precious metals, guaranteed by a performance bond from Deaton. Executor Marketing was unable to raise the initial $2.5 million called for in the contract,

and the parties agreed to lower the amount of the initial payment to $100,000 and to permit Executor Marketing to sell the ore to individual investors in one-ton units, with Executor Marketing receiving an option to buy 10,000 tons for each ton sold. Bretz represented that the money derived from the refining contracts would be used to complete the purchase of a refinery, which would be ready to go into production soon after he received the funds. Executor Marketing raised $250,000 for Bretz. The interstate transportation of checks used in payment for some of these transactions provided the basis for four substantive counts. No silver was produced.

The Executor Marketing people also attempted to find other financing for Bretz. Their efforts were coordinated by McCord, who claimed to be representing Bretz. Both Bretz and McCord helped to prepare a presentation for a $5 million loan which they hoped to obtain in New York. The loan presentation contained representations about Bretz' net worth, the high value of the ore, and the existence of processes. However, the New York loan fell through.

In a separate transaction, the basis for a single count of interstate transportation of a check taken by fraud, one investor advanced $25,000 to McCord in October 1974 after McCord told him that Bretz needed the money immediately to renew a contract with Becker. In August 1974, Bretz and Becker had entered a contract, which was described at trial as a back-up arrangement, whereby Bretz would advance up to $5 million to enable Becker to get into production on ore which Becker owned in Washington. Becker in turn would share the smelter returns with Bretz, purportedly for use in filling his obligations on the refining contracts. The contract also alluded to the possibility of a future agreement between the two men to have Becker process the Llano ore.

Money-raising efforts finally culminated in a trip to the Bahamas, where Executor Marketing representatives and other investors parted with approximately $500,000, at least part of which they had wired to the Bahamas, on the pretense that the money was needed temporarily as a cash advance for a security bond on a $10 million loan to be arranged by Deaton and Wolstencraft for Bretz at the Castle Bank in the Bahamas. McCord was present with the group in the Bahamas throughout, and Bretz arrived shortly after the investors had handed over their money. The loan, of course, did not materialize and the investors lost their money. A short time later, Tex-A-Chief received wire transfers totalling $60,000 from the Castle Bank, the basis for two of the wire transfer counts.

Other testimony at trial described efforts made in 1975 to find a commercially feasible extraction process in the hopes of getting into production as promised to investors. McCollom arranged to have an acquaintance lend McCord $12,500 in August 1975 in exchange for a cut of the smelter returns for the lender and McCollom.

This sketch of the facts by no means touches upon all of the many dealings which were described at the trial, but any further detail would overburden this opinion. We proceed now to discuss the issues raised by appellants.

The appellants urge generally that the evidence was insufficient to sustain their convictions for conspiracy. If we were to agree, the appellants' convictions on some or all of the substantive counts would likewise fall because their convictions are for the most part based on the *Pinkerton* rule, which permits holding each member of a conspiracy liable for all of the substantive offenses committed during his membership by any other member in furtherance of the unlawful agreement.[3] *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *United States v. Decker*, 543

---

**3.** Appellant Becker has asked us to limit the application of the *Pinkerton* rule to cases in which there is substantial evidence that the defendant directed or knowingly adopted the commission of the offenses. We decline to do so. Neither *Pinkerton* nor the decisions of this court had required that much. *See* cases cited in text, *supra*.

F.2d 1102 (5th Cir. 1976), *cert. denied*, 431 U.S. 906, 97 S.Ct. 1700, 52 L.Ed.2d 390. The effect of the *Pinkerton* rule is also an important reason for the appellants' insistence that three conspiracies existed rather than the one alleged, for each conspirator can be found guilty of only the counts associated with the particular conspiracy with which he was involved. Furthermore, the existence of three conspiracies is urged as a reason for holding that the trial court erred in denying the appellants' motions for severance. We first consider whether there was sufficient proof of any conspiracy and, if so, how many before addressing the sufficiency of the evidence as to each individual appellant's membership therein.

■ Conviction of conspiracy to defraud under 18 U.S.C. § 371 requires an agreement by two or more persons to work together for an illegal purpose plus the commission of an overt act by any one of them in furtherance of the agreement. *United States v. Trevino*, 556 F.2d 1265 (5th Cir. 1977); *United States v. Barrera*, 547 F.2d 1250 (5th Cir. 1977). Proof of the illegal agreement or common purpose may be inferred from circumstantial evidence, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Morado*, 454 F.2d 167 (5th Cir.), *cert. denied*, 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116 (1972), but the existence of the conspiracy must be proved beyond a reasonable doubt. *United States v. Palacios*, 556 F.2d 1359 (5th Cir. 1977); *United States v. Barrera, supra*. In determining whether the government adequately proved the existence of a conspiracy, we must view the evidence in the light most favorable to the government and accept all reasonable inferences and credibility choices which support the jury verdict. *United States v. Villarreal*, 546 F.2d 1145 (5th Cir.) (per curiam), *cert. denied*, 431 U.S. 917, 97 S.Ct. 2181, 53 L.Ed.2d 228 (1977). The government need not show that the conspirators articulated an express agreement, nor is it necessary that the plan be complete in all its aspects from its inception. *United States v. James*, 528 F.2d 999 (5th Cir.), *cert. denied*, 429 U.S. 959, 97 S.Ct. 383, 50 L.Ed.2d 326 (1976).

■ In this case the very structure of the activities supports an inference of an underlying agreement, even if it was unspoken. Thus, the testimony of several witnesses that no plan was ever discussed among the alleged conspirators did not prevent the jury from concluding, nevertheless, that the parties were proceeding according to an unspoken agreement to work together to defraud investors. The division of labor among the various defendants under the supervision of one or two directors supports the existence of a conspiracy. *United States v. Morado, supra*. The evidence showed that the work was divided among two groups, one responsible for handling the scientific aspects of analysis and extraction processes and another responsible for marketing the options and contracts. While the plan was perhaps not as successful as the conspirators desired, their activities appeared to be carefully orchestrated. Great attention was paid to securing official-looking documents, such as assays, contracts, and option certificates, yet the would-be silver producers never performed the type of careful on-site testing which Nickerson and other experts testified was essential for determining whether mining would be profitable. The jury could infer from this that the appellants were interested only in giving their operation an aura of legitimacy and not in actually establishing a bona fide workable refinery. The continuing nature of the operation is further circumstantial evidence of an underlying agreement.

■ As for the illegal purpose of the agreement, the government offered substantial evidence from which the jury could conclude that the ore was worthless and that no feasible commercial process existed. It was undisputed that no silver was ever produced in commercial quantities. Yet investors were told that the ore contained incredible amounts of precious metals and that the only stumbling block to large-scale production was a lack of funds, which the investors were to supply. The investors were never told that none of the purported

"secret processes" had ever been shown capable of operating at commercial levels. If the processes had any legitimacy at all, they were at best laboratory-level processes. Yet investors were told by Bretz and McCord that processing of hundreds of tons per day was possible. The jury could reasonably conclude that the assays shown to investors were false and that the appellants knew this. The government's evidence concerning the 1970 SEC investigation and the results of tests performed at that time were sufficient to permit the jury to believe that the ore was of no significant value. The sharp contrast between the results of Nickerson's tests and those of Cockrell's demonstration, one involving the same sample, justified the jury in concluding that the parties knew the true value of the ore and had falsified their assays for purposes of their scheme. McCord himself testified that he considered the high assays incredible. Even if the defendants believed that the ore was as valuable as they had represented, their statements about the status of production were fraudulent. We conclude that the government's proof of a conspiracy was sufficient.

▉ We reject the appellants' argument that the proof demonstrated the existence of three separate and distinct conspiracies. In his argument before us, each appellant has neatly compartmentalized his role so as to persuade us that the sale of silver options, the sale of refining contracts, and the Bahamas loan swindle were individual conspiracies. However, we are convinced after a careful review of the record that the government's theory of one umbrella conspiracy was adequately proved. The principal factors that we look to in resolving this issue are the existence of a common goal, the nature of the scheme, and an overlapping of participants in the various dealings. *United States v. Morrow*, 537 F.2d 120 (5th Cir. 1976), *cert. denied*, 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977); *United States v. Perez*, 489 F.2d 51 (5th Cir. 1973). We find each of these tests satisfied. The common goal toward which all of the appellants' various activities were directed was the amassing of money by false representations about the value of Llano ore and its commercial capabilities. While it is true that some members of the alleged conspiracy played more vital roles than others, each member's function was necessary and advanced the common purpose. *United States v. Morado, supra*. Every defendant need not participate in every transaction in order to make out one conspiracy. "If there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, then it is one conspiracy." *United States v. Perez, supra*, at 62.

▉ The nature of the scheme alleged required the assistance of many persons and the use of varied money-raising techniques. The plan does not become three plans simply because some members devoted themselves to one aspect rather than another. Nor is it a defense to the one conspiracy theory that some conspirators were unaware of the precise role played by others. As in *Blumenthal v. United States*, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947), the scheme was of such a nature that the participants knew or must have known that others were sharing in so complex a project, and it is no defense that some did not know the others or their parts.

▉ The evidence also showed considerable overlapping membership in each aspect of this conspiracy. For example, although Bretz did not sell any silver options with McCollom, he did participate in the preliminary dealings with McCollom which led up to the option sales. Kyle Bretz Enterprises submitted option contracts to members of McCollom's Executive Exchange, and some members purchased these options. Becker's assays and Cockrell's report were shown to investors in both the option and refining contracts transactions. Cockrell performed his demonstration for option brokers and other investors, but he used the Henderson process which Bretz had paid for. The Executor Marketing group which handled the refining contracts was also duped in the Bahamas loan swindle. Bretz was not

present in the Bahamas when money was paid over, but he turned up shortly after the funds had been solicited in his name. McCord is a thread running through all the transactions. The ore was passed from Texas Western, to Tex-A-Chief, to Shoreline Holding. Deaton's surety company was to guarantee both the options and the refining contracts. Deaton was a main figure in the Bahamas loan deal. In short, it is for the jury to decide whether the facts show one or more conspiracies, *Jolley v. United States*, 232 F.2d 83 (5th Cir. 1956), and the evidence clearly supports their decision.

 To establish the culpability of each individual defendant in a conspiracy, the government must prove beyond a reasonable doubt that each defendant knew of the conspiracy and had the deliberate, knowing, and specific intent to join the conspiracy, *U. S. v. Prince*, 515 F.2d 564 (5th Cir. 1975). *United States v. Baldarrama*, 566 F.2d 560 (5th Cir. 1978). Membership in a conspiracy and the requisite knowledge may be based upon reasonable inferences and circumstantial evidence. *United States v. Brasseaux*, 509 F.2d 157 (5th Cir. 1975); *United States v. Duckett*, 550 F.2d 1027 (5th Cir. 1977). The conspirators need not know each other nor be privy to the details of each enterprise comprising the conspiracy, *United States v. Baldarrama, supra,* as long as the evidence is sufficient to show that each defendant possessed full knowledge of the conspiracy's general purpose and scope. *United States v. Brasseaux, supra.* Direct proof of their agreement to cooperate in the scheme is not required, nor is it often available.

> Secrecy and concealment are essential features of successful conspiracy. The more completely they are achieved, the more successful the crime. Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others. Otherwise the difficulties, not only of discovery, but of certainty in proof and of correlating proof with pleading would become insuperable, and conspirators would go free by their very ingenuity.

*Blumenthal v. United States*, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947) (footnote omitted).

 We have already held that the government offered sufficient proof of the existence of a conspiracy. The evidence also plainly showed that each appellant performed actions which furthered the unlawful plan. To sustain the convictions, however, each defendant must be shown to have possessed the requisite knowledge and intent referred to above. It is in the appellate review of the sufficiency of the evidence of this final element that this court's "slight evidence" rule comes into play. Once it has been established that a conspiracy exists and that a particular defendant was clearly connected to the conspiring group or acted in a manner which unmistakably forwarded the conspiracy, then only slight additional evidence suffices to permit an appellate court to find that the jury could reasonably infer that one shown beyond a reasonable doubt to be a participant was in fact a *knowing* participant. *United States v. Trevino*, 556 F.2d 1265 (5th Cir. 1977). *See also United States v. Alvarez*, 548 F.2d 542 (5th Cir. 1977).

We hold that the evidence as to each appellant was sufficient to permit the jury to infer that each one possessed the requisite knowledge and intent. As for Becker and Cockrell, the evidence showed that their line of work placed them in a position to be familiar with the precious metal content of normal ores. The figures which they produced far exceeded the expectancy of even an exceptionally good mine, according to testimony of witnesses. Their figures were also in sharp contrast to the SEC results and Nickerson's results on the same sample which Cockrell used. And, in spite of the phenomenal silver content touted to investors, no silver was ever produced to fulfill the obligation on the options or contracts. The jury could reasonably infer,

then, that the Cockrell and Becker reports were false and were knowingly devised for purposes of aiding the others to dupe investors.

Cockrell insists on appeal that his only involvement in the scheme was the performance of a demonstration for which he received a mere $100. He also claims that he did not know that the persons who witnessed the demonstration were prospective investors. However, his position is hardly credible and the jury chose not to believe him. In fact, McCord testified that Cockrell had been informed that some of the persons attending the demonstration were option brokers. Nickerson's testimony indicates that he and Cockrell spent a great deal of time together during and after the demonstration, as well as during the earlier meeting in Dallas. Why a group of persons would show such a keen interest in Cockrell's work, particularly in view of the nature of that work, if it were not for investment purposes we do not know. McCord met Henderson through Cockrell, and Cockrell chose to use the Henderson process at his demonstration. The evidence also showed that Cockrell worked as a consultant for McCord for a year or so investigating processes for Llano ore as well as attempting to extract silver from X-ray films at a plant which McCord leased. He received no set fee; he was paid only if McCord had money. Otherwise Cockrell got nothing. The jury could infer that Cockrell had an interest in the financial success of the silver scheme. Other evidence also works against him, but we believe enough has been stated to sustain his conviction.

Becker claims to have the least connection with the others. However, certain elements of the evidence were quite damaging to him, despite his defense of a good faith belief in his process and the ore. We have already referred to evidence which would permit the jury to believe that Becker's assays were false. The evidence concerning his "nuclear affinity" process, which involved a black box with dials purchased from a man now dead whose use of the box was unknown, cast grave doubts upon his credibility. As for his knowing participation in the conspiracy, the testimony by Fisher about his phone call to Becker was perhaps the most damaging. From that phone conversation the jury could infer that Becker was aware of what the others were doing with his 1972 assay and that he intended to aid them by providing a second assay which confirmed the 1972 figures. Becker denied the phone conversation, but the fact that the promised second assay followed in short order serves to confirm that the phone call was made to him.

Shortly after Becker sent the new assay to Bretz, Becker and Bretz entered a multimillion dollar contract, which would provide Becker with funding to develop his own ore, or which, at least, could be used by the others in convincing the investors that silver would be available to meet their demands. The evidence did not spell out clearly how many meetings occurred before the contract was executed, but one witness testified that Bretz and Becker had met in his presence one time. It stands to reason that a contract involving such large sums of money would not be entered by persons totally unfamiliar with one another.

The testimony concerning the original purpose and use of Becker's 1972 assay no doubt damaged his credibility with the jury. Although there was no evidence clearly linking Becker to any of the other conspirators as early as 1972, the circumstances surrounding that early assay suggested that Becker attempted to use it as a means of attracting funding for the development of his processing plant. He prepared the 1972 assay on the behalf of an earlier owner of Llano ore who wished to use the ore as collateral for a loan from a New York bank. Becker wrote to the bank vouching that 125 tons of the ore were worth far in excess of the $2 million needed as collateral. He offered to extract 50 pounds of precious metals per day from the ore, if the bank so desired, provided the bank would advance him $100,000 so that he could expend his California plant. In his defense Becker sought to explain the letter

as a fair warning to the bank of the costs of converting the collateral into cash if the borrower defaulted. However, the jury could conclude that Becker was making false representations to the bank about the capabilities of his process. This, in turn, would damage his credibility as to his involvement in the conspiracy alleged. We conclude that Becker's conviction must stand.

McCollom also asserted a defense of good faith, but the jury verdict resolved the credibility choices inherent in that defense, and we cannot alter that outcome. In light of our holding in favor of the one-conspiracy theory, McCollom's efforts to show that his involvement was limited to the option sales cannot help him. McCollom asked the jury to believe that he never doubted the value of the Llano ore and that he trusted McCord and Bretz. However, McCollom knew that the early contracts which he had arranged for Bretz and McCord with members of the Executive Exchange were not paying off as promised. This should have alerted him to the fact that silver could not be produced, yet he continued to work with McCord on the option sales, permitting additional investors to lose money. He was present at Cockrell's demonstration of the Henderson process, and he played a key role in the option sales. According to McCord, the idea for options originated with McCollom and he brought Thomas and Merkatz into the sales. The jury could believe that, even if McCollom had been gullible at the outset, sufficient circumstances existed by the summer of 1974 to alert him to the fraudulent nature of the scheme and that his continued participation indicated that he was a knowing member of the conspiracy.

The evidence showed that McCollom needed money for his businesses and he profited handsomely from a few months' work. The option sales earned $39,000 for Gourmet Chef, an amount which the jury could believe far exceeded the legitimate value of the services which he provided. In addition to secretarial and clerical services, Gourmet Chef permitted Tex-A-Chief to use its Telex and Reuters machines. However, testimony indicated that those ma-chines normally rent for a few hundred dollars a month, while Tex-A-Chief was paying him an average of $13,000 per month on the option sales.

While options were being sold on Llano ore, McCollom attempted to purchase a mine and plant in Pearce, Arizona, with the aid of Cockrell as a consultant. This would suggest that McCollom was more familiar with the mining of precious metals than he wished to admit. He had also had an earlier involvement with a mine in 1965, at which time his balance sheet showed $63 million in minerals as an asset.

As late as August 1975, McCollom helped McCord obtain a $12,500 loan from another investor, and both were to share in part of the smelter returns. By that time there could have been no doubt about the prospects of repayment from Llano ore. The jury could infer that McCollom was aware of the fraudulent nature of similar representations all along. One investor testified that McCollom had assured him that the "product of a refining operation," which the witness took to mean refined silver, was stored in a warehouse. Yet McCollom failed to produce the warehouse receipts when the investor asked him to do so. We hold that McCollom's knowing participation in the conspiracy was adequately proved.

Bretz did not take the stand but offered other witnesses in his behalf. His good faith defense was based on his efforts to develop a commercially feasible extraction process. Bretz did spend money on various processes, but that fact does not rule out his culpability. Indeed, it serves to confirm his criminal involvement because he was clearly in a position to know that his representations to investors about the existence of processes were false. Yet he told them that he had three successful processes which would enable production to begin within a short time. He also circulated a financial statement which listed the value of the ore at $54 billion. He offered performance bonds which he knew or should have known were worthless. He showed up in the Bahamas shortly after the Executor

Marketing investors put up $500,000 in his behalf, a set of circumstances which the jury could find was not merely coincidental. In short, his guilt was proved beyond a reasonable doubt.

Bretz also challenges the sufficiency of the proof on seven of the substantive counts. As for the five counts of mail fraud, 18 U.S.C. § 1341, Bretz argues that the mailings alleged and proved where not for purposes of executing the fraudulent scheme, but were merely incidental or collateral to it. The mail fraud counts were based on the mailings by five victims seeking to exercise their silver options after holding them the requisite time. It is well settled that a mail fraud conviction can be based upon mailings performed by persons other than those accused, provided the defendants caused the mailings to occur, *Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954), and provided further that the mailings were for purposes of executing the fraudulent scheme, *United States v. Sampson*, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962). Three of the victims testified that McCord specifically directed them to mail him their options or letters authorizing exercise. Although the mailings occurred after the investors had paid for their options, they had not actually lost their investment until the attempted exercise failed. By the terms of the option agreement, they were required to hold the options for 180 days before exercising them. Thus, the delay and the subsequent use of the mails was envisioned as part of the scheme and served to lull the purchasers into a false sense of security. This six-month period, of course, permitted the defendants to proceed with their fraudulent scheme without detection. "It is a well-established principle of mail fraud that the use of the mails after the money is obtained may be for the purpose of executing the fraud." *United States v. Zweig*, 562 F.2d 962 (5th Cir. 1977). We hold that the mailings were caused by the defendants and were an integral part of their scheme. *United States v. Edwards*, 458 F.2d 875 (5th Cir. 1972). We also find that the wire fraud counts involving transfers of $60,000 from Castle Bank in the Bahamas to Tex-A-Chief's Dallas bank account were adequately proved. The timing of events permitted the jury to infer that the $60,000 wired to McCord was his share of the money taken from investors. The use of the wires was proved beyond a shadow of a doubt.

In light of our holding on the conspiracy issues, we are persuaded that the appellants have failed to demonstrate an abuse of discretion by the trial court in denying their motions for severance. "The mere fact that the conspiracy involved multitudinous and complex transactions is no reason for this court to reverse the denial of the motion to sever . . . ." *United States v. Wayman*, 510 F.2d 1020, 1024 (5th Cir. 1975). To justify reversal for failure to sever, the joint trial must be shown to result in compelling prejudice to the rights of the individual defendants, outweighing considerations of judicial economy. *United States v. Perez*, 489 F.2d 51 (5th Cir. 1973). This court has upheld joint trials in cases involving greater complexity and more defendants than this. *See, e. g. United States v. Morrow*, 537 F.2d 120 (5th Cir. 1976), *cert. denied*, 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed. 806 (1977). Joinder was proper here under the terms of Fed.R.Crim.P. 8 because the defendants were all alleged to have participated in the same series of acts or transactions, and the trial court could properly choose to avert the dangers of a joint trial by careful instructions. "The remedy of severance is justified only if the prejudice flowing from a joint trial is clearly beyond the curative powers of a cautionary instruction." *United States v. Morrow, supra*, at 136.

Bretz argues that a statement made during the final moments of the United States Attorney's closing arguments to the jury must be construed as a fatal comment upon Bretz' failure to testify. In response to Bretz' position that he was actually attempting to secure a process, the prosecutor stated:

They [investors] poured all of this money into Bretz and he brought you through

his attorney some checks that show around $75,000 of expenditures towards mining operations.

Because Bretz' attorney did not object to this statement at the time it was made, we may reverse only if we find plain error. While the phrasing of this remark was not ideal, we do not find it "of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Bates*, 512 F.2d 56 (5th Cir. 1975) *quoting Samuels v. United States*, 398 F.2d 964, 968 (5th Cir. 1968), *cert. denied*, 393 U.S. 1021, 89 S.Ct. 630, 21 L.Ed.2d 566 (1969). Rather, we believe that it fits within the category of a permissible "comment on the failure of *defense*, as opposed to the *defendant*, to counter or explain the testimony presented or evidence introduced [and] is not an infringement of the defendant's fifth amendment privilege." *United States v. Dearden*, 546 F.2d 622, 625 (5th Cir. 1977) (emphasis in original).

Bretz has also asked us to hold that the 25-year sentence imposed by the district court was excessive. However, this court has often held that the severity of a sentence lawfully imposed within the statutory limits will not be reviewed unless some defect in the sentencing procedures is shown. *Herron v. United States*, 551 F.2d 62 (5th Cir. 1977). None has been shown here. The appellant may seek a reduction of his sentence in the district court, pursuant to Fed.R.Crim.P. 35 within 120 days of receipt of this court's mandate of affirmance, *United States v. Gamboa*, 543 F.2d 545 (5th Cir. 1976).

As for the other issues raised by the appellants, we have given them our careful consideration and find them all without merit. The judgment is accordingly AFFIRMED.