UNITED STATES of America,
Plaintiff-Appellee,

v.

Raymond A. ENSTAM and Ralph Oliver
Holley, Defendants-Appellants.

No. 79–5537.

United States Court of Appeals,
Fifth Circuit.

July 31, 1980.

Rehearing Denied Sept. 15, 1980.

Emmett Colvin, David L. Botsford, Dallas, Tex., for defendants-appellants.

John T. Bannon, Jr., Washington, D. C., for plaintiff-appellee.

Before TUTTLE, RANDALL and TATE, Circuit Judges.

TATE, Circuit Judge:

The two defendants in this case were indicted under 18 U.S.C. § 371 for knowingly conspiring "to defraud the United States by impeding . . . the lawful Governmental functions of the Internal Revenue Service . . . in the . . . computation . . . and collection of . . . income taxes." Both defendants were convicted, and each now appeals on various grounds, including, *inter alia*, sufficiency of the evidence and improper evidentiary rulings. Although we were initially seriously concerned about the sufficiency of the evidence, we are now convinced that none of the defendants' contentions merit reversal. Therefore, we affirm both convictions.

### Context Facts

The two defendants, Raymond Enstam and Ralph Holley, were indicted, along with several others, as co-conspirators in a complicated money "laundering" scheme . Money illegally received from cocaine sales was first taken out of the United States to a corporation in the Grand Cayman Islands, part of the British West Indies. This corporation, Esmeraldas y Mariposas (E & M), then returned the illegal money in the form of fictitious loans to American corporations that had been created for the purpose of receiving these loans. As a result of this scheme, income otherwise taxable, albeit illegally obtained, was disguised as the proceeds of a non-taxable loan. The defendants argue that the object of the conspiracy was only to disguise the true source of the income and that there was no intent to impair the computation or collection of tax-

es. However, the record reveals that at least one of the objects of the conspiracy, if not the only object, was to impede the assessment of taxes.[1]

Several persons were involved in this conspiracy. Harold Oldham, a cocaine dealer, created the scheme. He was indicted along with the defendants, but he fled the jurisdiction prior to trial. Raymond Enstam, one of the defendants, was Oldham's lawyer. Prior to the advent of the conspiracy, Oldham asked Enstam to incorporate Oldham's Moroccan investment group in Morocco, but Enstam eventually recommended incorporation in the Grand Cayman Islands. Once the conspiracy had begun, it was Enstam who created the American corporations that were to receive the fictitious loans from E & M. The other defendant, Ralph Holley, allegedly received several of these fictitious loans from E & M through Brittle Oaks, Inc., of which Holley was president. Another co-conspirator, Paul Hodgson, pled guilty prior to trial and testified for the government.

Much of the testimony at trial came from two undercover agents, Agents Clayton and House, who had infiltrated the conspiracy. These agents purchased some cocaine from Oldham, they created a corporation through Enstam, and they went with Enstam to the Grand Cayman Islands to bring $50,000 that the agents supposedly wanted "laundered." The agent's testimony, together with that of co-conspirator Hodgson, formed the main basis of the government's case against Enstam. With respect to Holley, the agents' testimony was important, but much of the evidence was documents that provided circumstantial evidence of Holley's participation in the conspiracy.

I

Having briefly outlined the persons involved and the details of the conspiracy, we

1. As stated previously, we were initially concerned about whether the government had proved the existence of the conspiracy alleged in the indictment, which charged the defendants with conspiring "to defraud the United States by impeding, impairing, obstructing, and defeating the lawful Governmental functions of the Internal Revenue Service . . . in the ascertainment, computation, assessment, and collection of . . . income taxes." However, as discussed in Part I(a), *infra*, a careful review of the record has resolved our doubts in favor of the government's position.

turn to the issue that has most concerned us—whether the evidence is sufficient to support these two convictions. The defendants attack the sufficiency of the evidence on two grounds: 1) that there was insufficient evidence to show the existence of the conspiracy alleged in the indictment (*i.e.*, a conspiracy to defraud the United States by impairing the assessment and collection of income taxes); and 2) that even assuming the existence of such a conspiracy, there is insufficient evidence to prove that either one of them knowingly joined such conspiracy.

The evidence reveals no substantial issue as to whether income taxes were due on the monies (profits) sent to the Grand Cayman corporation and returned to the United States in the form of fictitious loans. The issue before us, therefore, is whether the evidence reasonably permitted the jury to find that the defendants knowingly conspired with others, in the terms of the indictment, *for the purpose of* "defraud[ing] the United States by impeding . . . the Internal Revenue Service . . . in the . . . computation . . . and collection of . . . income taxes."

(a)

The record is replete with evidence that there was a conspiracy to launder illegally obtained money. However, in brief and at oral argument, the defendants convincingly argued that the object of the conspiracy was to hide the source of the money but not *to impede the collection or assessment of income taxes.* At oral argument, government counsel was unable to point to any substantial evidence supporting the existence of the conspiracy alleged in the indictment. Our review of the testimony, however, reveals that there was indeed sufficient evidence to support a finding that one of the objects of the conspiracy was to impair or impede the computation or collection of taxes.

■ In assessing the sufficiency of the evidence, we must view it in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). When viewed in this light, the testimony leaves little doubt in our mind that the conspiracy alleged in the indictment was in fact proved.

Agent Clayton testified that the purpose of the scheme was to prevent the IRS, in the event of an audit, from having any questions about where the money had come from and that Oldham had told him that the scheme was "IRS-tested foolproof." Agent Clayton also testified that Enstam had told him that he and Agent House should try to make their corporation look as legitimate as possible so that they could obtain a company car, receive a salary, receive yearly bonuses, and arrange for "business" trips abroad.[2]

Agent House similarly testified that the scheme was designed to protect them in the event of an audit, that Oldham had said

**2.** Agent Clayton relevantly testified as follows:
Q In your mind, what did the term "wash" mean?
A It meant where I could go out and either invest in a business or invest in a home or invest in an automobile, and if I had—if I was audited by the Internal Revenue Service, they would look at my expenditures as being valid and I could account for all my money and where I derived those monies as being legitimate and not under the table funds.

. . . . .

A [Oldham] assured me it was foolproof, IRS-tested foolproof.
Record on Appeal, Volume III at 204–05.
Q Were you to receive any salary or compensation [from the corporation created for the agents by Enstam]?
A As determined by ourselves. Once this alleged loan came back in the form of a cashier's check to the bank, Mr. Enstam encouraged us to make this firm look as legitimate as possible . . . , for instance, an automobile for each of us as president and chairman of the board, possibly yearly bonuses paid to us, supposedly business trips or buying trips to abroad, whatever, and he directed us in these matters, you know, to set a salary and the like.
*Id.*, Volume IV at 314.
A Probably during the course of our conversations maybe Enstam or House was asking or conferring about "What are we going to do with all this money that we have now that we could spend it without being afraid of an audit" . . . .
*Id.* at 327.

that even the head of the IRS would not be able to figure out the scheme, and that Enstam had told them that they could get the money back from the corporation via a salary and new cars and write these things off as business expenses. House further testified that Enstam had said that House and Clayton could pretend to pay interest on the fictitious loan, get this interest back in the subsequent fictitious loan, and still deduct the interest from their federal income taxes.[3]

The testimony of the two agents strongly indicates that the object of the conspiracy was to obstruct the functioning of the Internal Revenue Service. Nevertheless, the defendants argue that the object was only to hide the true source of the income, which they assert is not unlawful. Without deciding whether the defendants' assertion is accurate, we think that there is sufficient evidence in the record for a reasonable juror to conclude beyond a reasonable doubt, *United States v. Barrera*, 547 F.2d 1250, 1257 (5th Cir. 1977), that one of the objects of the conspiracy was to impede the computation of income taxes.

We recognize that there is some ambiguity in the testimony of the two agents as to whether the only intent was to hide the source of the income. However, Enstam advised them concerning two different ways to evade taxes—reporting bogus business deductions and deducting fictitious in-

terest payments. The jury could thus reasonably have found from the evidence that the purpose of the conspiracy was to permit the recipients of the laundered cash to report the proceeds as income only when *or if* received by them as "income" from the corporation—in short, that the conspirators' taxable income (thus laundered by the loan) would only be reported to the extent that it was used in a non-deductible non-business fashion. Further, the jury could reasonably have inferred that even the part of the income that was to be reported would probably not be reported in the appropriate taxable year. All of these considerations, when combined with the repeated references by the co-conspirators to their fear of the Internal Revenue Service, lead us to the conclusion that there was sufficient evidence for the jury to find that one of the objects of the conspiracy was to thwart the effective functioning of the Internal Revenue Service.

To the extent that any ambiguity remains regarding the object of the conspiracy, this ambiguity is resolved by the testimony of Paul Hodgson, himself one of the conspirators. Hodgson admitted that the scheme had been presented to him as a "tax dodge," although he testified that he had only wanted to legitimize the money by hiding its source. Nevertheless, even Hodgson admitted that he intended to pay in-

**3.** Agent House relevantly testified as follows:

A I had told [Oldham] at that time that we [House and Clayton] felt like we wanted to get into something like this because we felt like IRS was perhaps either looking after it, looking at us, or would look at us, you know, in the near future and we wanted to be able to show where our money came from.
Record on Appeal, Volume IV at 410.

A [Oldham] said this way we would receive a cashier's check from a bank down there [in the Cayman Islands] and loan papers to a phony—to our phony company in the amount, let's say, $100,000 less [Oldham's and the bank's] percentages. We would deposit that, bring it back in the United States and deposit that check in our phony company account and utilize that money in any way we wanted to. He also said that—he said that the scheme is so simple, but it is—the Cayman Islands were utilized because the

secrecy tax laws and even the head of the IRS wouldn't be able to figure it out. He said you could have them over to your house and show him the loan papers and check them out because there wasn't anything they could do about it.
*Id.* at 411–12.

A [Enstam] told us that off of this corporation we could give ourselves a salary by ourselves, new cars, and write everything off. . . . He said that the interest we paid back, we could even pay the interest back, say we paid four or five thousand dollars interest in one year, that could go back to the Cayman Islands, go back to another phony account and draw it back as a loan later and also the interest is deductible on your federal income tax, we were taking our own money and deducting it from our federal income tax.
*Id.* at 448–49.

come tax only "[t]o a degree that [he] would be covered with the IRS."[4]

The trial judge charged the jury that it is not a crime to conceal the source of income as long as the income is in fact reported,[5] and it was forcefully contended at oral argument that at most the evidence showed a conspiracy to hide the illegal source of the laundered money. Our review of the evidence, however, has convinced us that there was sufficient evidence for a reasonable juror to conclude beyond a reasonable doubt, *United States v. Barrera, supra,* that the conspirators did not intend to report all the laundered income, nor necessarily to report any part of it in the year in which tax liability accrued. Thus, there was substantial evidence of a conspiracy "to defraud the United States by impeding, impairing, obstructing, and defeating the lawful Governmental functions of the Internal Revenue Service . . . in the ascertainment, computation, assessment, and collection of . . . income taxes," as alleged in the indictment.

(b)

The defendants next argue that even if there was sufficient evidence of the conspiracy alleged in the indictment, the evidence was not sufficient to prove that they knowingly and willfully became members of the conspiracy. As to Enstam, this contention has virtually no merit.

Agents Clayton and House both testified that Enstam knew about the conspiracy and helped them launder their money. Enstam testified differently, but the jury easily could have believed the testimony of the agents over that of one of the defendants. Enstam argues that he could not have knowingly joined a conspiracy to evade income taxes because the agents testified that he advised them to withdraw their money from the dummy corporation in the form of salary, which is itself *taxable income.* However, the previously quoted testimony of the agents also indicates that Enstam advised them to pretend to pay interest and then deduct it, Record on Appeal, Volume IV at 449, and that Enstam advised them to withdraw the money from the corporation in such a way that the money could be written off as business expenses, *id.* at 314, 448, and not reported as income. Viewing the evidence in the light most favorable to the government, *United States v. Glasser, supra,* there was substantial evidence that Enstam knowingly and willfully joined the conspiracy. *United States v. Malatesta,* 590 F.2d 1379 (5th Cir.) (en banc), *cert. denied,* 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777, and 444 U.S. 846, 100 S.Ct. 91, 62 L.Ed.2d 59 (1979).

With respect to Holley, the evidence was for the most part circumstantial. Never-

---

**4.** Hodgson relevantly testified as follows:

Q. Now, I believe in effect you have testified that Mr. Oldham's idea and these transactions was to use them as a, quote, tax dodge, end of quote. Is that correct?
A. Yes, sir.
Q. But that was not, in fact, your intention, was it?
A. My intention was to legitimize the use for money in use in business.
Q. Your intention was not to avoid taxes but to legitimize the money. Isn't that correct?
A. That's correct.
Q. *And you intended to pay taxes on all the money that you made, didn't you?*
A. *No, sir. I intended to pay taxes on part of it.*

[Hodgson was then questioned about a prior statement that he had made to certain agents in an interview, in which he had stated that he had intended to pay taxes on the money.

Hodgson acknowledged that he had made that answer.]

. . . . .

Q. *So your intent was to pay taxes?*
A. *To a degree that I would be covered with the IRS.*
Q. Well I understand that. You wanted to satisfy IRS, you wanted to, and you told these gentlemen [in the prior interview] back then you were not doing it to avoid taxes, right?
A. I told them, yes.
Q. Despite the fact that Mr. Oldham presented it to you as a tax dodge?
A. Yes, sir.
Record on Appeal, Volume IV at 544–47 (italics ours).

**5.** Record on Appeal, Volume I at 245. As stated previously, we do not now decide whether this instruction, in the context of a conspiracy case, was correct.

theless, the record reveals that there was substantial evidence to support the jury's finding that Holley knowingly and willfully participated in the conspiracy.

The indictment alleges a conspiracy between February 19, 1975 and December 28, 1977. The bulk of the testimony concerns incidents whereby co-conspirator Oldham, with the aid of Enstam, laundered money through E & M for Hodgson or on behalf of Agents Clayton and House in their undercover identities. Holley's alleged connection with the conspiracy arose out of allegedly similar transactions, during the time alleged, between Brittle Oaks, Holley's corporation, and E & M. Documentary proof, independent of statements made to the agents by co-conspirator Oldham, afforded a substantial basis for a finding that Holley's transactions formed part of the conspiratorial pattern. This documentary evidence and co-conspirator Oldham's statements, Fed.R.Evid. Rule 801(d)(2)(E), constituted an adequate basis for the jury's finding of Holley's guilt.

Both agents testified concerning statements by Oldham that Brittle Oaks, Inc. had been formed as a part of the conspiracy. Agent Clayton testified:

Oldham told me that he formed or had caused to be formed this Brittle Oaks company for some friends who lived in Florida. He explained that these, whoever had this company had purchased some land in Florida a while back with money they couldn't account for, illegal money, and that this Brittle Oaks company was created so as if IRS audited them in the future, it could be explained that the true owners of this land or how they obtained the money was from this firm Brittle Oaks.

Record on Appeal, Volume III at 245–46. Agent House testified concerning this same statement by Oldham:

He said, "We have a phony company by the name of—we started a phony company by the name of Brittle Oaks because [a friend in Tampa, Florida] wants to buy some property and he has got all this illegal money, illicit money, and he

doesn't know how to wash it. What I am going to do is give him a loan through Esmeraldas y Mariposas, that way he can show IRS how he paid for the property."

Record on Appeal, Volume IV at 413. In addition to the agents' testimony concerning statements by Oldham, the documentary evidence connecting Holley with both Brittle Oaks and E & M was substantial. Holley had purchased land in Florida, and he had closed the deal in the name of Brittle Oaks. *Id.*, Volume V at 603–08. Furthermore, various notes to E & M signed by Holley were introduced into evidence. *Id.*, Volume V at 623–24, Volume I at 195–200. See note 16, *infra*.

"[I]n testing the sufficiency of the evidence in [a] circumstantial evidence case it was the duty of the trial judge, before sending the case to the jury, to determine whether a reasonably minded juror must necessarily entertain a reasonable doubt under the evidence." *United States v. Barrera, supra,* 547 F.2d at 1255. Viewing the evidence in the light most favorable to the government, we think that a reasonable juror could conclude beyond a reasonable doubt that Holley knowingly and willfully joined the conspiracy, which (as we have held) is adequately proved to have had as its purpose impeding the Internal Revenue Service in its collection of income taxes.

## II

Having resolved the issue that initially concerned us, we now briefly discuss the three other alleged errors that are asserted by both of the defendants.

### (a)

The defendants contend that the trial judge erred in overruling their objections to the admission of Government's Exhibit 114, which was the minute book of a South Carolina corporation by the name of Peace River Trading Company. Further background is necessary for an understanding of the nature and purpose of this evidence and the defendants' reasons for objecting to it.

When Oldham first came to Enstam, (at a time prior to the present conspiracy), he

told Enstam that he had a South Carolina corporation, Peace River Trading Company, that he wanted to have formed into a Texas corporation of the same name. At that same time, Oldham said that he was involved with a group of investors in Morocco, operating as Mid-Eastern Investment Associates, and that he wanted Enstam to incorporate this business in Morocco. Enstam indicated that he didn't know anything about Moroccan law and advised against incorporating there. Oldham asked Enstam to suggest a foreign location, and after some research, Enstam recommended the Grand Cayman Islands.

At trial, Enstam testified that Oldham "had a group called the Mid-Eastern Investment Associates . . . *which owned the stock in this Peace River Trading Company. It consisted of [Oldham] and several other people that [Oldham] never identified.*" Record on Appeal, Volume V at 662 (italics ours). The Peace River Trading Company minute book was ostensibly introduced to impeach this statement by Enstam, because the minute book, which had been given to Enstam by Oldham, listed the shareholders in Peace River Trading Company. However, it appears that the initial reason for trying to introduce the book was to show that Holley was listed as one of the shareholders of Peace River Trading Company and thus to link Holley directly with Oldham. The district attorney first stated that the minute book was admissible to "show that the Defendant Holley knew and dealt with Oldham . . . . I think it tends to show knowledge on the part of the two co-conspirators." Record on Appeal, Volume V at 792.

The defendants object that the minute book was unauthenticated, that it was hearsay, that it was not in furtherance of the conspiracy, that it was given to Enstam prior to the existence of the conspiracy, and that its admission denied the defendants their right to confront witnesses, their right to effective assistance of counsel, and their right to due process. Most of these grounds for objection are either erroneous or irrelevant.

■ The government essentially argues that the minute book was only introduced to impeach Enstam and that therefore, it was not introduced for the truth of the information, but rather to show that a statement had been made by Oldham to Enstam that arguably told Enstam the identity of the Mid-Eastern Investment Associates. If the book was not used to prove the truth of the matter asserted, then it was not hearsay and it is irrelevant that the book was not part of the conspiracy. Furthermore, if the statement contained in the book was not hearsay, then there was no denial of the defendants' right to confront the witnesses against them.

■■ Although there is some confusion in the record as to the trial judge's basis for overruling the defendants' objection to the admission of this evidence,[6] the judge appears to have based his ruling on the ground that the book would only be admitted to prove that Oldham had made a certain written statement to Enstam [7] and not to prove that the statement was true. Given this limited basis for admission, the minute book was not hearsay, and most of the defendants' objections lack merit. The fact that Oldham made such a statement to Enstam was relevant to prove that Enstam was not being completely candid with the jury as to his knowledge of the members of the Mid-Eastern Investment Associates. The defendants' argument that the book was not authenticated is without merit, since Enstam identified the book as the minute book of Peace River Trading Company that had been given to him by Oldham. With respect to whether the probative value of this evidence outweighed any possible prejudicial effect under Rule 403 of the Federal Rules of Evidence, this was a matter within the trial judge's discretion, and the judge's ruling did not constitute an abuse of discretion.

**6.** Record on Appeal, Volume V at 789–805.

**7.** *Id.* at 801.

■ The only remaining contention that requires any discussion is defendant Holley's contention that the minute book was not admissible as to him. Had the trial judge given a proper instruction limiting consideration of this evidence to defendant Enstam, defendant Holley's contention would be without merit. However, the instruction actually given arguably allowed the jury to consider the evidence with respect to Holley, and, to this extent, the instruction was arguably improper. Nevertheless, defendant Holley's argument is without merit because Holley's attorney specifically asked the judge not to give an instruction stating that the exhibit was only admitted to prove that the statement had been made and not to prove the truth of the matter asserted.[8] Since defendant Holley himself objected to the proper limiting instruction, he cannot now be heard to complain that the proper limiting instruction was not given.

■ Government's Exhibit 114 was properly admitted against Enstam to prove that the statement in the minute book had been made by Oldham to Enstam. To the extent that the limiting instruction was not altogether correct, any objection by the defendant Holley has been waived. Moreover, in view of the evidence linking the defendant Holley with Brittle Oaks, E & M, and Oldham,[9] the error, if any, was harmless under Rule 52 of the Federal Rules of Criminal Procedure. We do not think that there is a significant possibility that the admission of this evidence had a "substantial impact" on the verdict of the jury. *United States v. Gomez*, 529 F.2d 412, 417 (5th Cir. 1976).

(b)

■ The defendants next contend that the trial judge erroneously admitted Government's Exhibit 32, a duplicate copy of a blank piece of E & M stationery that had been given to Agents Clayton and House by Oldham. The defendants argue that it was improper to admit the duplicate instead of the original because under Rule 1003 of the Federal Rules of Evidence a genuine question was raised as to the authenticity of the duplicate.

The defendants' contention is without merit. The xerox duplicate of the blank letterhead stationery was properly identified as a copy of the original. The question raised by the defendants as to the authenticity of the duplicate was spurious. (The defendants attacked its admission not because the copy was inauthentic, but rather because there was no explanation for the disappearance of the original and because the xerox copy did not show the original's colorings.) Record on Appeal, Volume IV at 413–18. Consequently, Government's Exhibit 32 was properly admitted under Rule 1003 of the Federal Rules of Evidence.

(c)

■ Both defendants rely on *Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931), to support their contention that the trial judge unduly restricted their cross-examination of the two undercover agents by refusing to allow questions concerning the agents' place of residence. This contention is without merit. *United States v. Alston*, 460 F.2d 48 (5th Cir.), *cert. denied*, 409 U.S. 871, 93 S.Ct. 200, 34 L.Ed.2d 122 (1972), and *United States v. Crockett*, 506 F.2d 759 (5th Cir.), *cert. denied*, 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975), have held that the *Alford* rule generally requiring disclosure of general background information is not a hard and fast rule. "[T]he case in which a witness might be in physical danger [is] an exception to the preference for disclosure." *United States v. Crockett*, 506 F.2d at 762. In the instant case, the witnesses were agents rather than informers, they were subjected to vigorous cross-examination, and their lives had been threatened by co-conspirator Oldham prior to his flight. Under the facts of this case, the judge's decision not to force the government agents to divulge where they lived was not an abuse of discretion.

---

**8.** *Id.* at 801–03.

**9.** See Part I(b), *supra*, and note 16, *infra*.

## III

Aside from their joint contentions, each defendant complains separately of certain errors. Defendant Enstam raises three alleged errors relating only to himself.

### (a)

Enstam first argues that the trial judge erroneously failed to strike alleged overt acts 13 and 14 and improperly included these alleged overt acts in his charge to the jury. These overt acts were alleged in the indictment as follows:

13. On or about October 6, 1977 RAYMOND A. ENSTAM, Paul Clayton and Herbert C. House had a conversation in Dallas, Texas.

14. On November 2, 1977, RAYMOND A. ENSTAM transported $50,000 in currency from Dallas, Texas to Miami, Florida and then to the Grand Cayman Island.

Defendant Enstam argues that both of these alleged overt acts should have been stricken from the indictment and excluded from the charge because they both involved only Enstam and the government agents and because overt act 14 was at variance with the evidence. Enstam's contention is without merit.

 Although it is impossible to conspire with government agents, *Sears v. United States*, 343 F.2d 139, 142 (5th Cir. 1965), it is only necessary for one co-conspirator to participate in an overt act, *United States v. Veltre*, 591 F.2d 347, 350 (5th Cir. 1979), because "[a]n overt act need not itself be a criminal act, as its only function is to demonstrate that the conspiracy is operative," *United States v. Buckner*, 610 F.2d 570, 573 (9th Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 1646, 64 L.Ed.2d 235 (1980). See *United States v. Wieschenberg*, 604 F.2d 326, 335 (5th Cir. 1979). Therefore, it is immaterial that only Enstam and the government agents participated in alleged overt acts 13 and 14 because these acts, if proven, clearly sufficed to show that the conspiracy was operative; both the conversation and the trip to the Cayman Islands involved attempts by Enstam to fulfill the purpose of the conspiracy. The trial judge properly refused to strike these alleged overt acts from the indictment.

 As to the variance between the evidence at trial and alleged overt act 14, this variance was immaterial. Although the evidence indicates that Enstam did not actually carry the $50,000 from Dallas to Miami, there is little question that Enstam accompanied the agents on the entire trip and that he physically carried the money from Miami to the Cayman Islands. Consequently, despite the legally-immaterial variance, Enstam's actions, as proved, sufficed as an overt act. The trial judge properly ruled that the government is not required to precisely prove every overt act as alleged. In fact, the judge stated that defense counsel would be able to emphasize the variance in his closing argument, and this tactic was used. Record on Appeal, Volume VI at 989–90. Rather than prejudice defendant Enstam, the obvious slight variance served as additional ammunition for Enstam's attorney in closing argument. *Id.*

The trial judge properly refused to strike alleged overt acts 13 and 14 from the indictment. The variance between the testimony and overt act 14 as alleged was legally insignificant, and both alleged acts served to show that the conspiracy was operative. Since the judge properly refused to strike these overt acts from the indictment, it was also proper for him to include them in his charge to the jury.

### (b)

Defendant Enstam next argues that the trial judge erroneously refused to grant his motion to suppress all evidence seized from defendant Enstam's office. Enstam argues that the search warrant was invalid because the underlying information used to obtain the search warrant was obtained by the undercover agents while they were in Enstam's office under false pretenses. Enstam's reliance on *Gouled v. United States*, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921), and *Fraternal Order of Eagles v. United States*, 57 F.2d 93 (3d Cir. 1932), is misplaced.

In *Gouled* someone obtained entry into a suspect's home by falsely representing that he intended to pay only a social visit. When the suspect had left the room, the intruder ransacked the suspect's private papers and seized some of them, and the Supreme Court held that the Fourth Amendment had been violated. However, in *Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), the Court held that an undercover agent could testify as to a drug transaction that he had witnessed while in a person's home under false pretenses. The Court stated that "to hold the deceptions of the agent in this case constitutionally prohibited, . . . would come near to a rule that the use of undercover agents in any manner is virtually unconstitutional *per se*," 385 U.S. at 210, 87 S.Ct. at 427, and this the Court refused to do.

■ Enstam's attempt to distinguish *Lewis* fails.[10] Enstam asked the two agents into his office to participate in the affairs of the conspiracy, and the agents did nothing more than keep their eyes open; they neither rooted in Enstam's papers nor seized anything before leaving. "The mere fact that [the agents] concealed [their] true identity did not nullify [Enstam's] waiver of Fourth Amendment rights." *United States v. Bullock*, 590 F.2d 117, 121 (5th Cir. 1979). The agents did not "see, hear, or take anything that was not contemplated, and in fact intended, by petitioner as a necessary part of his illegal business," *Lewis v. United States, supra*, 385 U.S. at 210, 87 S.Ct. at 427, and Enstam's motion to suppress was properly denied.

(c)

■ Enstam finally argues that the trial judge erroneously admitted Hodgson's testimony that Hodgson, Oldham, and Enstam all snorted cocaine in Enstam's office. Enstam admitted at trial that this evidence of an extraneous offense was relevant to show that Enstam had knowledge of the illegal source of the money being laundered, Record on Appeal, Volume VI at 520, but he contended that the prejudicial effect of this evidence outweighed any minimal probative value under Rules 403 and 404(b) of the Federal Rules of Evidence.

Enstam's contention is without merit. In the first place, in view of the extensive evidence of cocaine-dealing-profits, the evidence that Enstam once used cocaine is not, extraneously to the purpose for which introduced, unduly prejudicial.[11] Further, Enstam's entire defense was that he had participated in the various alleged acts without knowledge that the monies laundered were illegal cocaine profits. Given such a defense, evidence of this extraneous offense was definitely admissible to show Enstam's knowledge[12] under Rule 404(b), Fed.R. Evid., and the trial judge did not abuse his discretion in ruling that the probative value of this evidence outweighed any possible prejudicial effect under Rule 403, Fed.R. Evid.[13]

---

**10.** See *United States v. Ressler*, 536 F.2d 208, 211 (7th Cir. 1976), where a similar attempt to rely on *Gouled* and *Fraternal Order of Eagles* and distinguish *Lewis* failed. The court stated that the rationale of *Lewis* was "that an entry by an undercover agent is not illegal if he entered for the 'very purpose contemplated by the occupant.'" *Id.*

**11.** For instance, admissible evidence showed that Enstam had helped Hodgson cash a $51,-000 check quickly, knowing at the time or immediately thereafter that the proceeds were to be used for a quick cocaine deal. Record on Appeal, Volume IV at 538–43.

**12.** In arguing that the probative value outweighed any possible prejudicial effect, the prosecutor represented that Hodgson would

further testify that he had "said to Mr. Enstam, 'We might as well snort up some of the profits' or words to that effect." Record on Appeal, Volume IV at 522. This representation was later borne out when Hodgson testified, "I jokingly referred [to Oldham and Enstam] that we may as well snort up some of my profits or some of the profits." *Id.* at 543.

**13.** No limiting instruction was given when Hodgson's testimony was introduced, but the trial judge gave a general instruction regarding the use of evidence of extraneous offenses to show knowledge in his charge to the jury. Record on Appeal, Volume VI at 1041–42. See Part IV(b), *infra*. Enstam contends that the trial judge refused to give a cautionary instruction, Record on Appeal, Volume IV at 523, but

## IV

Defendant Holley also raises certain issues separately from defendant Enstam.

### (a)

Defendant Holley contends that in closing argument the prosecutor improperly went outside the record and improperly expressed his personal belief about the truthfulness of the witnesses when he twice characterized defendant Holley as a cocaine dealer. Our review of the record, however, shows that the prosecutor did nothing more, in context, than argue to the jury concerning reasonable inferences to be drawn from the evidence.

■ At one point, the prosecutor argued to the jury that defendant Enstam "was going to convince the Internal Revenue Service that $124,000 of ["loans" from E & M to] Brittle Oaks was a loan and no[t] proceeds from cocaine." Record on Appeal, Volume VI at 1014–15. Although this was not the only reasonable inference to be drawn from the evidence, we cannot say that this inference was not a reasonable one.[14] In any event, the judge immediately instructed the jury that it was "to recall the testimony of the evidence itself and not the argument of counsel." Record on Appeal, Volume VI at 1015.

Shortly thereafter, the prosecutor described the trial as a search for truth, and he told the jury that whatever way it decided the case, the United States would not really win or lose. In this context, the prosecutor made the following statements:

What this is all about is this, ladies and gentlemen: a jury trial is a search for the truth. The truth. What happened. The documents and testimony, the totality of that tells the truth. That is what I care about. That is what our system is all about. You are to determine the truth.

*Here is what the truth is in just one minute or less. Paul Larue Hodgson was a cocaine dealer and he needed a way to launder money. The Defendant Holley was a cocaine dealer and he needed a method to launder money.* The agents—

Record on Appeal, Volume VI at 1016 (italics ours). Defense counsel for Holley immediately objected, and the judge gave the jury the following instruction: "Well, you will recall the evidence, ladies and gentlemen, and you will make no finding unless it is based on the evidence and in accordance with my instructions." *Id.*

■ Defendant Holley contends that this was an improper assertion of the prosecutor's personal beliefs. However, although the prosecutor may have been slightly overzealous in characterizing the evidence, in context his statement concerning the "truth" was only his way of summing up the evidence. It was clear to the jury, in context, that the prosecutor was simply urging them to draw certain conclusions from the evidence.[15] To the extent that the prosecutor's statements exceeded the prop-

---

this refusal was only in response to defendant Holley's request "that some reference be made to this act conspicuously not having anything to do with Ralph Holley," *id.* There is no indication in the record that the trial judge would have refused a proper request to instruct the jury that this evidence could only be used as evidence of Enstam's knowing participation in the conspiracy. *See generally id.* at 513–25.

**14.** Oldham had told Clayton and House that he had created Brittle Oaks for a friend in Tampa, Florida so that the friend could purchase some land with illegally earned money and explain to the Internal Revenue Service, if necessary, where the money had come from. Record on Appeal, Volume III at 245–46 and Volume IV at 413. In the context of this case, it would not have been unreasonable to infer that this illegal money had been derived from cocaine sales. In addition, Oldham had made several references to an associate in Tampa, Florida from whom he had purchased cocaine. *See, e. g.,* Record on Appeal, Volume IV at 425, 432–33, 470–71. While the jury could have reasonably concluded that these statements referred to the person arrested with Oldham, it would not have been unreasonable to reach the conclusion that defendant Holley was the person to whom Oldham was referring.

**15.** "[A]n attorney's statements that indicate his opinion or knowledge of the case as theretofore presented before the court and jury are permissible if the attorney makes it clear that the conclusions that he is urging are the conclusions to be drawn from the evidence." *United States v. Morris,* 568 F.2d 396, 401 (5th Cir. 1978).

er bounds of argument, the error was cured by the judge's immediate instruction and was therefore harmless under Rule 52 of the Federal Rules of Criminal Procedure.

### (b)

■ The trial judge instructed the jury that evidence

concerning alleged acts related to that charged in the indictment . . . is admitted for the limited purposes of assisting [the jury] in determining the intent or knowledge with which a Defendant may have acted. . . . [E]vidence of an alleged related transaction may not be considered by the jury in determining whether an accused committed the acts alleged in the indictment. . . . [Y]ou may consider such evidence of another transaction of like nature in determining the state of mind, or intent, or knowledge with which an accused may have done the act charged in the indictment, but only if you first find that the other evidence standing alone establishes beyond a reasonable doubt that the Defendant committed the act alleged in the indictment.

Record on Appeal, Volume VI at 1041–42. Defendant Holley does not object to the substance of this instruction. Rather, he contends that the trial judge erred in refusing to specifically outline for the jury the evidence to which this "related offenses" charge referred. Holley argues that the judge should have told the jury that the charge related to: 1) Enstam's snorting cocaine; 2) the admission of the Peace River Trading Company minute book; and 3) Enstam's transaction with Agents Clayton and House. Holley further argues that none of this evidence applied to him and that the jury should have been so instructed. We find, however, that some of this evidence did apply to Holley, that Holley suffered no prejudice, and that the judge did not abuse his discretion.

"[A] trial court is given broad discretion in wording its jury instructions and will not be reversed as long as the charge correctly states the substance of the law," *United*

*States v. L'Hoste*, 609 F.2d 796, 805 (5th Cir. 1980). The trial judge correctly instructed the jury on the applicable law, but he refused Holley's request because he felt that it would require commenting on the evidence. Record on Appeal, Volume VI at 956. The judge told the attorneys that analyzing the evidence would be a more appropriate subject for argument to the jury. *Id.* Under the facts of this case, the judge did not abuse his discretion.

The purpose of instructing the jury concerning related or extraneous offenses is to insure that a defendant will not be convicted for conduct other than that charged in the indictment. The trial judge's instruction adequately served this function. The jury was specifically told the limited purpose for which evidence of other offenses could be used, and it was also told that such evidence could not be used until after it had been determined beyond a reasonable doubt that the defendant or defendants had committed the acts alleged in the indictment. Further elaboration in the context of this case might have done more harm than good; an attempt by the judge to review the complicated facts of this case might have caused more confusion than clarification. At the very least, no prejudice resulted from the trial judge's decision not to go beyond an explanation of the applicable law.

With respect to the admission of the Peace River Trading Company minute book, this evidence was only properly admissible to impeach Enstam, but defendant Holley specifically requested the judge not to give such a limiting instruction. See Part II(a), *supra.* Consequently, to the extent that the limiting instruction actually given was ambiguous or confusing, it was attributable to Holley. Further, we doubt that the minute book was properly includable in the trial judge's extraneous offense charge because it did not constitute evidence of an extraneous offense; at most the book tended to prove a connection between Oldham and Holley.

Finally, even if the jury did improperly rely on the minute book as evidence against

Holley, in view of the extensive evidence linking Holley, Brittle Oaks, E & M, and Oldham together,[16] there is no significant chance that such error had a substantial impact on the jury's verdict. *United States v. Gomez, supra,* 529 F.2d at 417.

■■■ With respect to evidence of the transaction between Enstam and Agents Clayton and House, once the jury found that Holley was a knowing participant in the conspiracy, evidence of Enstam's transaction with the agents was admissible against Holley as evidence of an overt act committed by a co-conspirator. See Part III(a), *supra.* Since the jury was properly instructed not to hold a defendant responsible for the acts of any other conspirators until after having determined that that defendant had knowingly joined the conspiracy, Holley's contention that this evidence was not admissible against him is without merit. We are convinced that no prejudice resulted from the trial judge's refusal to specify this evidence in connection with the extraneous offense charge. This evidence was relevant to prove an overt act, and the jury was not limited to using this transaction as evidence of intent.

The trial judge properly instructed the jury on the use of extraneous offenses, and under the facts of this case the judge did not abuse his discretion by refusing to comment specifically on the evidence. Furthermore, even if the judge's ruling was in error, Holley has not shown that any substantial prejudice resulted.

### Conclusion

Although we were initially concerned about whether the government had proved the existence of the conspiracy alleged in the indictment, a review of the record re-

veals that this burden was definitely met. Finding the defendants' other contentions to be without merit, we affirm both convictions.

AFFIRMED.

TUTTLE, Circuit Judge, concurring in part and dissenting in part:

I concur in the opinion and judgment of the Court so far as it affects the conviction of Enstam, but with deference I dissent from the judgment affirming the conviction of Holley, and the part of the opinion dealing with his conviction.

The record here clearly demonstrated that Enstam and Oldham had conspired to set up a number of corporations, within the United States and in the Cayman Islands for the purpose of laundering money from United States citizens to hinder and delay the Internal Revenue Service in the collection of income taxes. It is also clear that Oldham and Enstam dealt with IRS agents, thinking they were candidates for such service. The record also disclosed that Holley was president of a corporation known as Brittle Oaks and that he had taken title to some land he had bought by placing it in Brittle Oaks. It also discloses that there were letters purporting to be from Brittle Oaks to the Grand Cayman corporation which *Enstam* and *Oldham* knew to be engaged in the money washing scheme. There was also evidence that the Grand Cayman corporation made a series of loans to Brittle Oaks at about the time that Holley purchased the land whose title he placed in that corporation. My difficulty is that the IRS agents' testimony as to what Oldham told him was the purpose of the Grand Cayman corporation and Brittle Oaks cannot be imputed to Holley unless and until it is shown by substantial evidence that Hol-

---

16. Aside from Oldham's statements concerning his friend in Tampa, Florida and Brittle Oaks, see Part I(b), *supra,* and the agents' testimony concerning the Brittle Oaks stationery showed to them by Oldham, see Part II(b), *supra,* there also was the following evidence connecting Holley, Brittle Oaks, E & M, and Oldham: 1) at the request of Oldham, Enstam created correspondence purporting to be from Holley to Oldham's man in E & M, Derek Price, Record on

Appeal, Volume V at 818–19; 2) various notes in favor of E & M and signed by Holley were found in Oldham's possession when Oldham was arrested, as were various letters either to Holley from Oldham's man in E & M or vice versa, *id.,* Volume V at 614–16 and Volume 1 at 199; and 3) Holley initiated a purchase of land in Florida in his own name, but he used the name of Brittle Oaks when the deal was closed, *id.,* Volume V at 607–08.

ley had knowledge of the income tax—money washing scheme. The only evidence we have that Holley knew of this is from statements made by Oldham to the IRS agents.

In *United States v. James*, 590 F.2d 575 (5th Cir. 1979), this Court en banc held that before a hearsay statement can be used to inculpate an alleged co-conspirator:

> The court must determine as a factual matter whether the prosecution has shown by a preponderance of the evidence independent of the statement itself (1) that a conspiracy existed, (2) that the co-conspirator and the defendant against whom the co-conpirator's statement is offered were members of the conspiracy, and (3) that the statement was made during the course and in furtherance of the conspiracy . . ..

590 F.2d at 582.

Here, I do not find any evidence in this record from which a jury could infer that because Oldham and Enstam had set up a scheme to enable anyone whom they could interest in such a deal to use their corporations to wash their ill-gotten gains for tax purposes, then Holley must be deemed to have been aware that these corporations were of such a character, and that his dealing with them could be the basis of a jury finding that he participated in such conspiracy.

In this case, the only way the jury could properly know of the existence even of the conspiracy between Oldham and Enstam was the agents' testimony as to what Oldham told him. Other than this, there is nothing in the record from which a jury could infer that when Holley dealt with Brittle Oaks and when that corporation dealt with the Grand Cayman corporation, Holley was dealing with members of a conspiracy to defraud the United States Internal Revenue.

I fully agree that the proven transaction that Holley engaged in appears to be quite similar to the transactions that Oldham had explained to the revenue agents, and in which they purported to participate. I simply do not believe that the fact of this similarity of dealings between Holley and

the other two corporations is sufficient to justify the submission to a jury of the question of Holley's knowing participation in the conspiracy.

I would affirm as to Enstam and reverse as to Holley.