UNITED STATES of America,
Plaintiff-Appellee,

v.

John Paul BROWNING,
Defendant-Appellant.

No. 82-5752
Non-Argument Calendar.

United States Court of Appeals,
Eleventh Circuit.

Jan. 30, 1984.

Thomas G. Murray, Miami, Fla., for defendant-appellant.

Stanley Marcus, U.S. Atty., Samuel Smargon, Asst. U.S. Atty., Miami, Fla., for plaintiff-appellee.

Before VANCE and JOHNSON, Circuit Judges, and PITTMAN*, District Judge.

JOHNSON, Circuit Judge:

Appellant John Paul Browning, along with three others, was indicted under 18 U.S.C.A. § 371 for conspiring to defraud the United States. Specifically, the indictment alleged a conspiracy to defraud the

---

* Honorable Virgil Pittman, U.S. District Judge for the Southern District of Alabama, sitting by designation.

United States by "impairing, obstructing, and defeating the Internal Revenue Service, an agency of the United States government, in its lawful function of identifying revenue and collecting tax due and owing on such revenue." Browning was tried separately and convicted as charged. In this appeal, Browning raises a single challenge to his conviction: was the evidence sufficient to support the jury's finding that he knowingly participated in the charged conspiracy? Concluding that it was, we affirm his conviction.

In 1979, the FBI began an undercover investigation into illegal drug trafficking and smuggling in South Florida. The front for this investigation was a company called C.R.V. Associates (CRV) in Dade County, Florida. On the surface, CRV appeared to be an investment counseling firm with a commercial listing in the telephone directory and a business office in Miami, Florida. In reality, however, CRV was operated by the FBI for the purpose of discovering the source of the drug trade in South Florida by identifying the individuals involved in laundering the large amounts of cash generated by illegal drug transactions. To this end, CRV operated solely on a referral basis and the only business conducted by CRV consisted of offering its customers a variety of money laundering services. The money laundering schemes set up by CRV for its customers typically involved counting and converting illegally obtained United States currency into some other form of negotiable instrument, such as a cashier's check, or transferring the currency to corporations or bank accounts set up by CRV in foreign countries. The laundering process was complete when the money was returned to its owners in the form of fictitious loans or salaries from offshore corporations. Meetings between CRV customers and the undercover FBI agents held at CRV's offices were videotaped by the FBI. Nine videotapes of various meetings among Browning; his co-indictees, Donald Raulerson, Billy Maddox and Robert Ewan, Jr.; and CRV agents were admitted into evidence at Browning's trial and played for the jury.

In April of 1980, Donald Raulerson, the head of a large marijuana importation business operating in South Florida, was referred to CRV. On twenty-three separate occasions between April 24, 1980 and July 31, 1981, Donald Raulerson and other members of his organization, Billy Maddox, Robert Ewan Jr., and John Paul Browning, brought a total of over four million dollars into the CRV offices to be laundered.

Browning was first introduced to CRV agents when he accompanied Raulerson to a meeting with FBI Agent Gaffney on June 27, 1981, for the purpose of opening a bank account for Raulerson in the Grand Cayman Islands. In Browning's presence, Raulerson and Gaffney discussed opening the account and Raulerson gave Gaffney $10,000 for this purpose. Browning told Gaffney that he had previously tried to set up a corporation in the Grand Cayman Islands in order to conceal his ownership of "drug boats." Gaffney advised Browning that CRV could set up a corporation for him in the Grand Cayman Islands. Browning and Raulerson told Gaffney that they were having difficulties collecting on their "merchandise," a term referring to their sales of marijuana.

On the morning of July 31, 1981, Raulerson called Gaffney and told her that Browning would be coming to CRV offices with $300,000 to transfer to a Panama bank account. Later that day, Browning arrived at CRV offices with $293,350 in currency. The first hour of this three-hour meeting between CRV agents and Browning was videotaped and played for the jury at Browning's trial. During this meeting, Browning told Gaffney that they were having better luck collecting on their merchandise than before, and that he would like Gaffney to open an account for him in the Grand Cayman Islands. Browning's statements during the meeting further revealed that he was aware that the money he had brought to CRV was to be wired to an offshore account, that he had counted money for Donald Raulerson in the past, that he was involved in Raulerson's marijuana importation business, and that he knew Billy Maddox and Robert Ewan, Jr., and their involvement in Raulerson's marijuana importation and money laundering operations.

Browning contends that the evidence was insufficient to establish that he knowingly

participated in the charged conspiracy. We disagree.

In reviewing the sufficiency of the evidence in a criminal case:

> It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could conclude that the evidence establishes guilt beyond a reasonable doubt. · A jury is free to choose among reasonable constructions of the evidence.
>
> United States v. Bell, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc) [1], aff'd on other grounds [—— U.S. ——], 103 S.Ct. 2398 [76 L.Ed.2d 638] (1983).

Further, "[i]n applying this standard all reasonable inferences and credibility choices must be made in favor of the jury verdict, and that verdict must be sustained if there is substantial evidence to support it when the facts are viewed in the light most favorable to the government." United States v. Pintado, 715 F.2d 1501, 1503 (11th Cir. 1983) (quoting United States v. Davis, 666 F.2d 195, 201 (5th Cir. Unit B 1982)).

■ In prosecutions under 18 U.S.C.A. § 371 for conspiracy to defraud the United States, the government is required to prove the essential elements of an agreement to defraud the United States and that one or more persons acted in pursuit of that objective. United States v. Booty, 621 F.2d 1291, 1297 (5th Cir.1980).[2] Because the essential nature of conspiracy is secrecy, such an agreement may be proved by circumstantial as well as direct evidence. United States v. Horton, 646 F.2d 181, 185 (5th Cir.1981); see United States v. Enstam, 622 F.2d 857, 863–64 (5th Cir.1980). In order for a reasonably minded jury to find that the defendant was a member of the conspiracy, "[t]he government must have shown beyond a reasonable doubt, if only by circumstan-

tial evidence, that a conspiracy existed, that [the defendant] knew of it and that he intended to associate himself with the objectives of the conspiracy." United States v. Horton, 646 F.2d at 185. The defendant may be found guilty of conspiracy if the evidence demonstrates that he knew the essential objectives of the conspiracy, even though he did not know all of its details or played only a minor role in the overall scheme. United States v. Alvarez, 625 F.2d 1196, 1198 (5th Cir.1980) (en banc).

■ The evidence presented in this case was clearly sufficient to meet the government's burden of proof under these standards. In this case, the evidence established the existence of a conspiracy with the complementary objectives of laundering illegally obtained money in order to hide the true source of such income, and, as charged in the indictment, of impairing the IRS in its function of identifying revenue and collecting taxes due and owing on such revenue. We find substantial evidence of Browning's knowing participation in both objectives of the conspiracy.

First, we find that "[t]he record is replete with evidence that there was a conspiracy to launder illegally obtained money." United States v. Enstam, 622 F.2d at 861. Indeed, all of the evidence presented at Browning's trial, including both the testimony of the undercover FBI agents and the videotapes of the meetings at CRV offices, arose in the course of money laundering activities. CRV accepted referrals only for customers seeking money laundering services and never conducted any legitimate business. Every transaction between CRV and the conspirators in this case involved either the actual laundering of money generated by Raulerson's marijuana business or a· discussion of a money laundering scheme. The evidence is overwhelming that one of the objectives of the conspiracy was to launder illegally obtained money.

---

1. In Stein v. Reynolds Securities, Inc., 667 F.2d 33, 34 (11th Cir.1982), this Court adopted as binding precedent the post-September 30, 1981, decisions of the Unit B panel of the former Fifth Circuit.

2. In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted the case law of the former Fifth Circuit handed down as of September 30, 1981, as its governing body of precedent, which is binding unless or until overruled or modified by this Court en banc.

Likewise, the evidence was clearly sufficient to demonstrate that Browning participated in the conspiracy with knowledge of its money laundering objective. Browning's presence during the July 27, 1981, meeting between Raulerson and Gaffney for the purpose of laundering money through a Grand Cayman Islands bank account, coupled with his comments concerning his previous attempt to set up a corporation in the Grand Cayman Islands to hide his ownership of drug boats, establishes his knowledge of the money laundering objective of the conspiracy. Browning's act of delivering the money to be transferred to a Panama bank account,[3] together with his statements that he knew the purpose of his delivery, and his request that CRV establish a similar account for him, establishes his participation in the conspiracy with knowledge of its money laundering objective.

Second, we find that the evidence in this case demonstrated an additional objective of the conspiracy: impairing the identification of revenue and the collection of tax due and owing on such revenue. The money laundering schemes utilized by the conspirators in this case consisted of converting money illegally received from marijuana sales into other forms and returning the money to its owners as the proceeds of fictitious loans. "As a result of this scheme, income otherwise taxable, albeit illegally obtained, was disguised as the proceeds of a non-taxable loan." *United States v. Enstam,* 622 F.2d at 860. Whether the form of the money laundering transaction alone is sufficient to support the jury's finding that one of the objectives of the conspiracy was to impair the identification of revenue and the collection of tax due and owing on such revenue is a question that, as in *United States v. Enstam,* we do not reach on this record. In this case, there is ample evidence that one of the purposes of the money laundering schemes utilized by the conspirators was to thwart the effective functioning of the IRS.

In a videotaped meeting among CRV agents, Donald Raulerson and Billy Maddox on September 17, 1980, Raulerson stated that his purpose in laundering the money was to hide the source of the income in the event of an audit by the IRS.[4] During this meeting, Raulerson also discussed with the agents the tax advantages of the fictitious loans.[5]

3. This delivery was listed as an overt act in furtherance of the conspiracy in the indictment:
12. On or about July 31, 1981, in Miami, Florida, the defendant John Paul Browning delivered approximately $299,940 in cash to a representative of C.R.V. to be wire transferred to Panama, South America.
Record at 26.

4. Gov. Exs. 11 & 12 at 21–22, 23:
DER [Raulerson]: Say I come down here and got a check, a cashier check for a million dollars.
RKC [FBI agent]: Right.
DER: I bought this piece of property with it, right?
RKC: Right.
DER: Alright, the Internal Revenue when my file my income tax, they're gonna say where did you get these million dollars from?
RKC: Um hum.
DER: I borrowed it. Who'd you borrow it from?
RKC: From an offshore corporation.
DER: Or whatever. I'm asking you. I got the check from y'all.
RKC: You could do it through an offshore corporation.

DER: I mean, how do y'all so . . . set y'all's books up books up, showing where y'all give me a check for a million dollars.
AF [FBI agent]: We have ah, we have an accountant ah, and an attorney who works with us.
DER: Alright, can I say I borrowed the money from
AF: Yes, you can, ah we got a couple of people doing the same thing.
DER: That's what I say. I need to know ahead of time,
AF: Yeah
DER: To where I don't get myself backed in a corner 'cause I'm gonna have to show where I borrowed this million dollars from some God damn where or 'nother.
. . . .
DER: But I'm, I'm that's why I'm putting the corporation down there to keep me from taking the checks here.
RKC: Um hum.
DER: 'Cause I got the IRS on my ass anyhow. About a million dollars.

5. *Id.* at 61:
RKC: Now are you gonna take the tax advantages on a loan?

In a videotaped meeting between Billy Maddox and CRV agents on November 24, 1980, Maddox requested that CRV set up a corporation for him in the Grand Cayman Islands to launder money and return it in the form of a fictitious consulting fee from the corporation. Maddox advised the agents that he wanted the fictitious fee set up as a payment in the next taxable year for a sale he had supposedly made for the corporation because he did not wish to report any more income in the current year.[6] Maddox's reason for not wanting to show a large amount of income in any one taxable year was to avoid attracting IRS attention and a possible audit.[7]

> DER: I don't know nothin' 'bout all that bullshit.
> RKC: Okay. You got ... you know you can,
> DER: Um hum
> RKC: See if you have it coming in as a loan, you can take a lot of tax advantages on, a loan .... As far as your interest payments,
> DER: Um hum. Yeah I'm gonna set it up right, like a 30 year deal see?
> ....
> DER: Gonna have it in a circle I'm gonna just take and put everything I own and borrow me about 5 million dollars, something like that.

6. Gov. Exs. 13 & 14 at 30–31:

> BM [Billy Maddox]: Ah, say if I come down here and, and ah, you could backdate it, where that ah ... I made the money this year. See I don't want to show any more money this year. I showed a pretty good bit. I, I've made the sale this year but you're paying me next year and I'll pay the taxes on it. See, after the first of the year. You see what I'm saying? You don't have to pay taxes on anything until you get paid for it.
> RKC [FBI agent]: Right.
> BM: I mean, I wanna pay taxes on the money.
> RKC: Ah ha
> BM: Okay?
> RKC: Um hum.
> BM: ... this is what I'm making.
> RKC: Um hum.
> BM: I've been to work, I've been working with this corporation for 6 months. I finally made a sale but you paid me next year.
> RKC: Well that's no problem.
> BM: Okay.

7. *Id.* at 36–37:

> RKC: Have, have you ever been audited?
> BM: No.
> RKC: No.

In a videotaped meeting between Raulerson and CRV agents on March 13, 1981, Raulerson told the agents that his bookkeeper was aware that the loans received from CRV were sham transactions, but that he was not concerned because he had previously bribed the IRS agent who had performed his audit and as a result was audited "for nine hundred and sixty-three thousand dollars. Well, they could've hit me for more than that, hit me for about two million."[8] Raulerson also discussed his hesitation in setting up a corporation in the Grand Cayman Islands for fear that the Grand Cayman Island authorities might release information to the IRS.[9]

> BM: Never.
> RKC: Yeah, see as long as, as long as you're paying in that and they don't ... I mean they see a guy who pays a ... a lot of income tax, they're gonna let him alone. As far as they
> BM: I, I've never been touched.
> RKC: But I, I ... I tend to think that there's probably some people that they probably audit every year.
> BM: There is. Here, here's some of those mistakes okay. They go, they buy a new Mercedes, new pick-ups, new truck, pay off their houses, buy boats, buy this ... and rings and this and that and everything's paid cash. They don't owe a goddamn thing. They got a 50,000 dollar year income and how—where the hell did they get all of this?
> ....
> RKC: What hurts these guys is when they fill out a simple form and they're just living like ah ... you know...
> BM: Well they do it (unintel) when the Internal Revenue gets on your ass, you're in trouble.

8. Gov. Exs. 17 & 18 at 7.

9. *Id.* at 13:

> AF [FBI agent]: From our experiences, we think that the Caymans are better.
> DER [Raulerson]: Yeah, but everybody's lookin' at the goddamn Caymans all the time.
> AF: They may be lookin' at 'em but they're not gettin' shit outta there.
> DER: You don't think they'll turn over information.
> AF: No, no.
> RKC [FBI agent]: No, no.
> DER: What if it was a sus, sus, suspect, like say, somebody like me and they went down and say, we suspect this son of a bitch here.

In light of this evidence, we hold that the jury could reasonably find that one of the objects of the conspiracy, if not the primary object, was to impair the identification of revenue and the collection of tax due and owing on such revenue by preventing the IRS, in the event of an audit, from raising any questions as to the source of the income, by failing to report taxable income in the appropriate taxable year, and by deducting fictitious interest payments on nontaxable sham loans.

All of these considerations, when combined with the repeated references by the co-conspirators to their fear of the Internal Revenue Service, lead us to the conclusion that there was sufficient evidence for the jury to find that one of the objects of the conspiracy was to thwart the effective functioning of the Internal Revenue Service. *United States v. Enstam*, 622 F.2d at 862.

Further, we conclude that the evidence was sufficient to support the jury's finding that Browning knowingly and willfully participated in the conspiracy with the objective of impairing the identification of revenue and the collection of tax due and owing on such revenue. As we have held, the evidence in this case demonstrated a single conspiracy with dual, complementary objectives: laundering money to disguise the source of illegal income and through the money laundering scheme to impair the identification of revenue and the collection of tax due and owing on such revenue. Browning's knowing participation in the money laundering objective of the conspiracy is clear and, coupled with the videotapes of his co-conspirator's statements concerning the purpose of the money laundering scheme in impairing the effective functioning of the IRS, is sufficient to support a reasonable inference that the money laundering transaction in which Browning knowingly participated was also an integral part of the purpose of the overall scheme to impair the effective functioning of the IRS. *Cf. United States v. Enstam*, 622 F.2d at 864.

For these reasons, we AFFIRM Browning's conviction under 18 U.S.C.A. § 371 for conspiracy to defraud the United States by impairing, obstructing, and defeating the Internal Revenue Service, an agency of the United States government, in its lawful function of identifying revenue and collecting tax due and owing on such revenue.

RKC: Suspect isn't enough. Suspect of what? Suspect of, of violating American tax laws? I mean it depends on what it is.

DER: Yeah.